**STATE, Plaintiff-Appellee, v. CURNUTT, et, Defendant-Appellant.**

Ohio Appeals, First District, Hamilton County.

Nos. 6974 & 7003.  Decided October 1948.

6

Carson Hoy, Samuel Rubenstein, Cincinnati, for plaintiff-appellee.

Chester R. Shook, Stanley M. Silversteen, Cincinnati, for defendant-appellant.

## OPINION

By ROSS, J.:

Two appeals on questions of law are presented:—the first, an appeal from the judgment of the court of common pleas of Hamilton County, in which the defendant is sentenced to death; the second, an appeal from an order of the court of common pleas of Hamilton County overruling a motion for new trial, upon the ground of newly discovered evidence. Both appeals were considered at the same time by this Court and will be disposed of in this opinion.

The indictment upon which the defendant was convicted and sentenced charges that "Ova B. Curnutt, alias Ova B. Cornett, on or about the Second day of December in the year nineteen hundred and forty-seven at the County of Hamilton and State of Ohio, aforesaid, did aid, abet or procure one Elmer Curnutt to unlawfully, purposely and in perpetrating a robbery, kill one Thomas Wilson, then and there being, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio." This indictment clearly charges the defendant with the crime of murder in the first degree, as defined in §12400 GC, for· by the provisions of §12380 GC, an aider and abettor "may be prosecuted and punished as if he were the principal offender." The defendant is not only charged with aiding and abetting the principal in the commission of the robbery, but also definitely charged with aiding and abetting the principal in killing the deceased.

No Bill of Particulars was requested by the defendant. The trial court did not err in refusing to quash the indictment upon motion of the defendant.

The principal evidence in the case, sustaining the conviction, involves a confession of the defendant and the testimony of his accomplice, Elmer Cornett, the principal in the crime, each of which sustains the verdict beyond any reasonable doubt.

The defendant on the stand denied that he had at any time made any admission of guilt. The confession was testified to by at least four police officers, who agreed upon the main points of the statement. At the time Elmer Cornett, nephew of the defendant and his accomplice, testified, he was under sentence of death, having been convicted as a principal in the commission of the crime of which the defendant is charged as an aider and abettor.

From the evidence it appears that Elmer Cornutt visited his uncle, the defendant, on the morning of December 2nd, 1947, that during the day the robbery and death of Thomas Wilson was planned. That· the defendant's residence is at 1517-19 Race Street, Cincinnati, and that Wilson's place of business is located at 1521 Race Street, Cincinnati. That the defendant supplied his nephew with a black jack, flash light, and glove, that the defendant took his nephew to Wilson's cafe, that he in detail described how he could effectively strike Wilson by requesting a bottle of beer, which would require Wilson to lean over in securing it from an ice chest, that he cautioned his nephew that Wilson's death was necessary, since he had met the nephew in the defendant's presence, that the nephew came to the defendant's room

after committing the crime and was transported by defendant in his automobile out of the City, that the defendant received $63.00 from the nephew, a little more than half of the proceeds of the robbery, which the defendant expected would produce some $20,000.00, it being thought that Wilson was a miser and had at least that sum on his premises. The evidence fully justified the conclusion of the jury and the degree of proof required was fully met.

In this appeal the defendant has presented eight assignments of error. The seventh and eighth only require comment. No error, prejudicial to the defendant is found in the incidents of the trial and the preliminary proceedings covered by the first six assignments of error.

The seventh assignment of error is concerned with the refusal of the trial court to give certain special charges. Under the law governing criminal procedure in this State, the defendant is not entitled as a matter of right to have the court give such charges. As mere requests for instruction in the general charge, it appears that the court covered in its general charge those instructions to which the defendant was entitled.

The eighth assignment of error is concerned with the refusal of the court to present to the jury a form of verdict for murder in the second degree. The evidence in the case justified only three possible verdicts:— (One) guilty as charged; (two) the same, with a recommendation of mercy, and; (three) not guilty.

It is impossible to conceive how the defendant could have been found guilty of murder in the second degree, involving under its definition (§12403 GC) a purposeful, malicious killing, without requiring necessarily the conclusion that the defendant was guilty as charged, in view of the fact that the robbery was clearly proved. The only possible justification for such a verdict would be that the jury believed that the defendant conspired with his nephew merely to unlawfully and maliciously kill Wilson, but not while perpetrating a robbery. Such a finding would be directly contrary to the evidence in the case. It will be noticed that in §12403 GC, the crimes discussed in "the next three preceding sections" are excluded from the application of §12403 GC. Sec. 12402-1 GC, was not in effect when §12403 GC (R. S. 6810) was enacted, and is therefore not included in such "three preceding sections." The trial court committed no error in refusing to submit a form of verdict from murder in the second degree. The general exception did not present any error in failing to submit other forms of verdict. **Todor v. State of Ohio, 113 Oh St, 377, 378.**

It is the conclusion of this Court that the defendant had a fair trial before an impartial jury and that no error, prejudicial to the defendant, intervened.

In the second appeal, the action of the trial court in refusing to grant a new trial on the ground of newly discovered evidence is advanced as error, prejudicial to the defendant.

In an opinion of the trial court the evidence submitted upon the motion for new trial upon the ground of newly discovered evidence is reviewed and is supported by the record.

Judge Morrow states:

"A self-confessed murderer, now in death row, retracts his previous account of the crime wherein he had named his uncle as an aider, abettor, and fellow conspirator. Accordingly, this court is asked to grant a new trial on newly discovered evidence, in behalf of the uncle, now also in death row, and who was convicted as such aider, abettor and fellow conspirator, in a trial wherein the self-confessed murdered (and nephew) testified against his uncle.

"The nephew has spoken and written rather often concerning this crime. Evidence of the prosecution indicates as follows:

"He told a girl in Kentucky he had committed murder; he admitted the murder to police officers in Arkansas, and he involved his uncle when conversing on a plane en route to Cincinnati from Arkansas. When in the Hamilton County Jail after arrival in Cincinnati he wrote a twenty page account in his own handwriting again involving his uncle, and which was given to a detective for the Prosecuting Attorney. He was questioned in the Prosecuting Attorney's office in the presence of his uncle by the Prosecuting Attorney, his Assistant, and also by Detectives. During this oral examination he again involved his uncle by his statements, and as an aider, abettor and conspirator. As noted above, he testified twice against his uncle after his own conviction of the murder, and he made remarks to the criminal bailiff indicating his uncle's guilt as an aider, abettor, and conspirator.

"Furthermore, as noted above, he expressly denied in writing a statement set forth on the wall of the Hamilton County Jail ascribed to him whereby it was made to appear that his uncle was innocent of participation in the crime.

"Uncle and nephew since early April have been imprisoned in the same cell block in Columbus, and since that time this retraction of previous testimony by the nephew has occurred.

It appears from an affidavit of a Penitentiary guard that communication between the nephew and uncle has been possible since the time above mentioned.

"The affidavit by the nephew Elmer on the 20th of April, repudiating his previous testimony and statements, and as expanded by his testimony on the stand on the 21st of May, is an extraordinary effort.

"For the first time since December 2nd, the night of the murder, we learn of a new actor,—a George, whose last name 'is something like Warfield,' who said he was from the nephew's birthplace, Catliff, Kentucky. He now appears as an arch-villain. He it was who butchered the victim while Elmer held the flashlight, and he it was who compelled Elmer thus to participate in the crime, by threatening his life and the life of his mother. He also threatened the same penalty if Elmer told on him. So Elmer now states.

"The uncle, Elmer says, knew nothing of the murder— had nothing to do with it. Not until April 20th in his statement of retraction did Elmer say a word to anybody about George. He claims he started to tell the Arkansas police but they abused him and would not believe him. The Arkansas police deny this. He claims he also tried to tell Cincinnati detectives who came to Arkansas for him, but they paid no attention. This is also denied. Elmer testified on the 21st day of May, 1948, that the lawyers appointed to defend him were never told by him about George, and no relative or friend or well-wisher since Elmer's conviction has been asked by Elmer to locate George.

"In short, until the 20th of April Elmer has kept locked in his bosom the information that he was an unwilling participant in the murder, and that George did it. The information supplied by him up to that time included a confession that he himself robbed and did the victim to death, and at the instance of his uncle who helped him escape, and with whom he divided the loot obtained from the victim.

"Elmer's past statements, that is to say prior to his repudiation, are explained as follows:

"(1) He was threatened and abused by the Arkansas police immediately after his arrest;

"(2) He was alternately threatened and made false promises by the Cincinnati detectives who brought him from Arkansas, and who thereby procured him to state his uncle was his aider and abettor;

"(3) He made statements on the stand in the two trials of his uncle at the instance of detectives who had threatened him, and who also led him to believe 'They would help him when the time came,' if he involved his uncle.

"The above is a resume of the situation presented to the trial court at this time by the retraction of Elmer, the nephew.

"The Court of Appeals approved Elmer's conviction.

"We are asked to grant a new trial to one named as an aider and abettor by the self-confessed murderer, and who now repudiates such statements. The self-confessed murderer is facing imminent execution, and it is submitted that he is a penitent facing death.

"Elmer states he gave perjured testimony at the trial wherein his uncle was convicted. The question in a case of this sort, wherein a new trial is asked on the ground of such newly discovered evidence, is: When did the witness tell the truth?

"In effect, we are asked now to determine whether the nephew told the truth at the trial of the uncle, the story then stated being plausible, and, furthermore corroborated by admissions of the uncle and other circumstances; or are we to believe the story the nephew now tells, which is so improbable in view of its background as to be almost incredible, and which not only exculpates his uncle entirely but the nephew himself as well."

In some respects, the evidence given by the nephew upon hearing of the motion for new trial complied with the specifications applicable to evidence justifying the granting of a new trial. It could not have been ascertained before or during the trial since the nephew did not divulge his repudiation of his testimony given at the trial until some considerable time thereafter. It might have affected a verdict, if submitted upon retrial. It was competent, material, relevant, and not merely cumulative. The recanting witness could not be prosecuted for perjury, since he was executed shortly after making his statement of repudiation. The question here presented is did the trial court commit error by refusing a new trial under the circumstances set forth in the record? Is the trial court bound to grant a new trial simply because of the repudiation by a principal witness of testimony given at the trial; the new evidence meeting the requirements applicable to newly discovered evidence, or may the trial court exercise a sound discretion in appraising the value of the new evidence in determining the right to a new trial? If he cannot so exercise discretion, then any conviction is subject to attack, and such conviction must be set aside merely because a critical witness tells one story at the trial and another conflicting story upon motion.

It must be remembered that while the evidence given by the nephew, a fellow conspirator with the defendant, was most effective in securing a conviction of the defendant and

was repudiated, still the state had introduced the confession of the defendant as well as other incriminating evidence. The probable effect of the absence of the nephew's testimony upon the case of the state is speculative and problematical.

If the nephew had made pre-trial statements similar to those for the first time presented on the motion, he would certainly not have been called as a witness for the state. He might have been presented as a witness for the defendant.

In 39 Am. Jur., p. 175, "New Trial", Section 169, it is stated:

"In a criminal prosecution, recantation by the state's witnesses will support an application for a new trial. It has been said to be the duty of a trial court to grant a new trial where a witness at the original trial subsequently admits on oath that he committed perjury, or even that he was mistaken in his testimony, provided such testimony related to a material issue, and was not merely cumulative."

This question is not a novel one, and has been considered by courts of last resort. Such discretion in refusing a new trial has been sustained in Bolton v. State of Indiana, 223 Ind., 308, wherein it is stated in the syllabus:

"Recantation by an important witness of his or her testimony at the trial does not necessarily, or as a matter of law, entitle the defendant to a new trial, but the determination of such matters rests in the sole discretion of the trial court whose action will not be set aside except for clear and manifest abuse."

Again, in New York v. Shilitano, 218 N. Y., 161, it is stated in the 5th and 6th paragraphs of the syllabus:

"Evidence of recantation on the part of a witness is newly discovered evidence, and, therefore, of a character which would justify granting a new trial, but it cannot be said, as a matter of law, that a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony, since there is no form of proof so unreliable as recanting testimony. The question in such case is whether the evidence of recantation which is presented is of such a character and weight as to justify this court in setting aside the judgment entered upon the verdict of the jury.

"The recanting statements presented a question primarily for the trial judge, who had seen and heard the witnesses

upon the trial, to determine whether they were of such weight as to justify him in setting aside the verdict, and in view of the character of the evidence offered to impeach the judgment, and the decision of the trial judge denying the motion for a new trial, the case fails to present a situation in which this court should substitute its judgment for that of the jury and the trial judge."

In People v. Smallwood, 306 Michigan, 49 it is stated at page 58 of the opinion:

"The motion was mainly based on a claim of new testimony —that the girl had later repudiated her former testimony. We have frequently looked with disfavor on later admissions by a witness, that he or she had committed perjury in the trial, as a ground for granting a new trial. There was no abuse of discretion by the trial court in the case at bar in denying the motion. Plainly, a new trial (if one were held) would result in acquittal, if the complaining witness should adhere to her subsequent repudiation of her testimony. Under quite similar circumstances, this court upheld the lower court's denial of a new trial in People v. Van Den Dreissche, 233 Mich. 38."

Bolton v. State of Indiana, supra, is followed by annotation in 158 A. L. R., at page 1062. It is stated editorially therein:

"A study of the cases in the original annotations and those decided subsequently indicates that the courts, with their experience with witnesses, generally pay but little regard to the statements of a recanting witness, and only in extraordinary and unusual cases will a new trial be allowed because of the recanting statements."

And, again on page 1065:

"When a new trial is sought upon the ground that a witness subsequently states that he gave perjured testimony, the question is, When did the witness tell the truth? Recantation by an important witness of his or her testimony at the trial does not necessarily, or as a matter of law, entitle the defendant to a new trial, the determination of such matters resting in the sound discretion of the trial court, whose action will not be set aside except for clear and manifest abuse. Moore v. State (1939) 59 Ga. App. 456, 1 SE (2d) 230; Bolton v. State (Ind.) (reported herewith) ante, 1057; State v.

Zeilinger (1938) 147 Kan. 707, 78 P (2d) 845; State v. Wynn (1934) 178 Wash 287, 34 P (2d) 900; State v. Snyder (1939) 199 Wash 298, 91 P (2d) 570."

To the same effect is the case of Henderson v. State, 135 Fla. 548 where it is stated in the 9th and 10th paragraphs of the syllabus:

"Motion for new trial is addressed to sound discretion of trial court, and presumption is that he exercised such discretion properly.

"Generally, unless it clearly appears that trial court abused its discretion, trial court's action on motion for new trial will not be disturbed by the appellate court."

In the instant case, the trial court was presided over by an experienced judge, who had spent many years upon the bench. It may be presumed that he knew that the justice of a sentence of death was before him, and that the heavy responsibility attendant upon his continuing to sustain such sentence was fully apprehended. He had before him the witnesses whom he had opportunity to observe when giving their testimony at the trial. He patiently listened to the new evidence in which there was, as hereinbefore noted, much to refute the repudiation by the principal in the crime.

It cannot be said in view of all the circumstances in this case that he abused his discretion in refusing a new trial.

The judgment is affirmed.

MATTHEWS, PJ, ROSS & HILDEBRANT, JJ, concur in syllabus, opinion & judgment.