[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION AND JUDGMENT ENTRY
This case is on appeal from the February 18, 1997 judgment of the Lucas County Court of Common Pleas, which sentenced appellant, Dale L. Beckett, following his conviction on one count of murder, in violation of R.C. 2903.02, with a firearm specification (R.C.2929.71 and 2941.141). An appeal was also taken from a subsequent order dated July 27, 1998 denying the motion of appellant for a new trial. These two cases have been consolidated on appeal. Appellant asserts the following assignments of error on appeal:
"ASSIGNMENTS OF ERROR
"FIRST ASSIGNMENT OF ERROR
 "THE COURT WRONGLY DENIED DEFENDANT'S SUPPRESSION MOTION, THEREBY CAUSING UNRELIABLE EYEWITNESS TESTIMONY TO BE ADMITTED AT TRIAL. APPELLANT'S CASE WAS IRREPARABLY PREJUDICED BY THIS ACTION.
"SECOND ASSIGNMENT OF ERROR
 "THE TRIAL COURT COMMITTED ERROR BY PERMITTING ADMISSION OF IDENTIFICATION TESTIMONY OF A WITNESS WHO, THOUGH UNABLE TO MAKE A POSITIVE IN-COURT IDENTIFICATION, HAD IDENTIFIED APPELLANT FROM A PHOTOGRAPH.
"THIRD ASSIGNMENT OF ERROR
 "THE VERDICT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
"FOURTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED ON THE STATE'S PRIME WITNESSES RECANTATION OF HIS PRIOR TESTIMONY.
"FIFTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED MISCONDUCT ON THE PART OF THE STATE IN FAILING TO DISCLOSE ITS AGREEMENT WITH MR. WILLIAMS.
"SIXTH ASSIGNMENT OF ERROR
 "APPELLANT IS ENTITLED TO A NEW TRIAL BASED MISCONDUCT ON [SIC] THE PART PROSECUTION IN ITS OFFERING INTO EVIDENCE TESTIMONY IT KNEW OR SHOULD HAVE KNOWN WAS PREJUDICED.
"SEVENTH ASSIGNMENT OF ERROR
 "MISCONDUCT ON THE PART OF THE PROSECUTION IN ITS OBTAINING THE TESTIMONY OF WILLIAMS, OR ON THE PART OF WILLIAMS IN OFFERING HIS TESTIMONY, DENIED APPELLANT HIS RIGHT TO A FAIR TRIAL AND DENIED HIM DUE PROCESS.
"EIGHTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN ALLOWING AND NOT CORRECTING IMPROPER REMARKS MADE BY THE PROSECUTOR DURING HIS CLOSING REMARKS.
"NINTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF TONY PIERSON WITH REGARD TO A .25 CALIBER AUTOMATIC PISTOL.
"TENTH ASSIGNMENT OF ERROR
 "THE CUMULATIVE EFFECT OF THE ERRORS WHICH OCCURRED DURING APPELLANT'S TRIAL DEPRIVED APPELLANT OF A FAIR TRIAL AND UNDERMINES THE RELIABILITY OF THE JURY'S VERDICT AND DEPRIVED APPELLANT OF HIS RIGHTS TO A FAIR TRIAL AND DUE PROCESS."
Appellant was indicted on a charge of murder, with a firearm specification. The following evidence was presented at trial.
Ronald Cunningham's body was found by Toledo police at 8:30 a.m. on February 17, 1996. He was found laying face down, with his hands in his pockets, in a vacant lot at 1259 Prospect Avenue near Detroit Avenue. Cunningham's body was laying south to north, ten feet from the sidewalk. He did not have any money on him. Cunningham was killed by a gunshot wound to the neck. The estimated time of death was sometime after midnight and before 8:30 a.m. that day. The gunshot wound had a downward trajectory, entering from behind the left ear. Forensic testing revealed that the shot had been fired from less than one foot. Witnesses for the prosecution could only speculate as to the size of the murder weapon.
Ouida Gordon, Cunningham's girlfriend, testified that Cunningham had been unemployed and sold drugs to support himself. Gordon further testified that appellant, Cunningham, and she had often socialized together and sometimes with Tony Pierson. She last saw Cunningham on February 16, 1996. He left her mother's house around 1:30 p.m., acting nervous, because he owed James Spivey $40. She saw him again around 4:00 p.m. and spoke to him briefly to give him $20 toward the money he needed to pay off his debt. Cunningham was standing on the corner of Prospect and Detroit Avenues in his usual area for selling drugs. She saw him again early the next morning from 1:30 to 2:30 a.m. at a friend's home. On cross-examination, however, she testified that Cunningham stayed until 3:30 or 4:00 a.m. Cunningham left to get some drugs while Gordon slept on the couch.
Gordon testified that Cunningham called her about one week before his death and told her how appellant had hunted him down to collect on a debt. He further told her that he had given appellant a greenish-tan trench coat as payment. She testified that appellant also had disagreements with others over drug deals.
Anthony Pierson testified that he is currently imprisoned and has had twelve or thirteen felony convictions in the past for various theft and related offenses. He testified that appellant and Cunningham would both stay with Pierson on occasion. Pierson recalled that Cunningham owed appellant money in January 1996. The two had a heated conversation about the money on Pierson's front porch. The debt arose out of a drug deal where Cunningham either messed up or deliberately kept the profits. Prior to this time, appellant had argued with Cunningham about money he owed a friend of appellant. Appellant was looking for Cunningham in January 1996, and Pierson sent him to a mission where Cunningham was staying. Appellant took some of Cunningham's clothes he found in Pierson's home as "collateral." The next day, they came to Pierson's house and the argument seemed to be resolved. Pierson also testified that he was a passenger in appellant's car in mid-January 1996, the evening of the argument between appellant and Cunningham on the porch. During the ride, Pierson observed a .25 semiautomatic pistol under the front seat arm rest in appellant's car. When Pierson questioned appellant about carrying a gun while under a disability, he stated that he would always carry one.
Matthew Williams, a long-time acquaintance of appellant, testified regarding statements appellant had made regarding killing Cunningham. Williams is currently imprisoned for a parole violation and has had several felony and misdemeanor convictions. He testified that appellant stopped him about 1:00 p.m. on February 14 or 15, 1996, and followed Williams to a car wash to talk to him. When Williams got into appellant's car, appellant and Phil, the owner of the car wash, were already in the car. Phil was telling appellant that he wanted Cunningham dead for messing up something concerning money and drugs. Phil was trying to describe Cunningham for appellant because appellant did not know him. As they were talking, Cunningham came out of a nearby convenience store. Appellant got out of the car and started walking toward Cunningham and then returned to the car and said "Don't worry about it. That nigger dead." Phil then gave appellant half an ounce of crack cocaine as a partial payment. Appellant never did talk to Williams about what appellant had said he wanted to talk to Williams about.
Appellant called Williams again on February 21, 1996 about 10:00 or 10:30 a.m. asking for some drugs. During the conversation, he said, "Ain't nobody got to worry about that one thing no more." When Williams inquired further what that meant, appellant said, "That nigger, Cunningham, he dead." Williams arranged to meet appellant that evening to give him some drugs. When Williams approached his house around the appointed time, he saw someone crouched down low beside the house. Williams yelled at the person who then ran. Williams got in his car and chased the person. He saw a car leaving the alley without its lights on and followed it. When he caught up with the car, he found out it was appellant. Appellant said that Williams had scared him because he thought Williams was the police. Williams never did give appellant any drugs.
Williams returned to prison on a parole violation four days later. Williams saw appellant again in prison. Williams questioned appellant about the rumors on the street that he killed Cunningham. Appellant stated that he would kill his mother for the right price. Appellant admitted that he was coming home one night and saw Cunningham. Appellant stopped Cunningham, made him put his hands in his pockets, and then shot him in the head. Williams testified that he first heard about Cunningham having his hands in his pockets from appellant; but, on cross-examination, admitted that it was general knowledge in the neighborhood. Appellant also admitted to Williams that he was hanging around Williams' house that evening in February intending to rob the man Williams was going to hook him up with to buy drugs. Appellant intended to shoot the man because appellant knew that the man was not the type to just give up anything. Appellant admitted that he was going to shoot Williams too. After hearing that, Williams called Detective Forrester to tell him that appellant had admitted to killing Cunningham.
Sheila Sakina McNeal, sometimes referred to as Sheila Burton, testified as follows. She has a criminal record for petty theft. At the time of the murder, she made money by directing people to drug dealers in the neighborhood surrounding Detroit and Prospect Avenues. She was "working" that morning in the area of Oakwood Street. Around 4:00 a.m., she was walking with two men who turned down Lincoln Street. She stopped in front of the Lincoln School to smoke cocaine when she heard a gunshot. She immediately turned around and headed back to Oakwood Street. She knew that it was 4:00 a.m. because as she was leaving the area she saw someone she knew heading for work and asked him the time. She also had seen Norma Eaton standing on the corner. Five seconds after hearing the gunshots, McNeal heard Eaton ask someone whether he wanted a date, but McNeal could not see the person. Later, near dawn, she saw a man at a telephone booth across from Lincoln School. She spoke to him briefly. She identified appellant from a photo array as possibly being the man to whom she had spoken. However, she could not identify him at trial.
Pierson also testified that the morning of the murder he was avoiding drug dealers whom he had cheated and did not return home until around 2:30 a.m. He remained awake smoking crack. He heard a single gun shot maybe around 4:30 a.m. Pierson thought that it was unusual to hear a single gun shot in that neighborhood. The sound came from the Detroit/Prospect area.
Norma Eaton testified that she knew Cunningham because they lived in the same area at one time. She did not know appellant, Anthony Pierson, or Matthew Williams. She testified that she left her home around 3:00 a.m. February 17, 1996. She was going out to wait on the street for a ride to go to "dinner." While she was standing in front of the Lincoln School, she saw Sheila McNeal standing farther down the street. Eaton walked back and forth in the area from 3:05 a.m. until 5:00 a.m. The area was well lit by streetlights. Around 4:00 to 4:30 a.m., she heard a gun shot coming from Prospect Street. She then saw someone run through the field a short distance away. She called to the person asking him if he wanted a date. He stopped and looked at her and then ran toward the school parking lot. The streetlight shone directly on him, and she could see clearly that he was wearing a black leather hat with a "bib," black leather coat, and either blue or black dark-colored pants. He had a "thick, stocky" build. She identified appellant at trial as the person she had seen just as she had in photo arrays prior to trial. Although she could not give a detailed description regarding the clothing or the man's face, she stated that she could recognize him if she saw him again and was certain that appellant was the man she had seen.
Steven Forrester, a Toledo police detective, testified that he determined with Eaton's assistance that she was approximately fifteen feet away from the man she saw the night of the murder. He also testified regarding the photo arrays he presented to Eaton before she identified appellant as the man she had seen. He testified that the police investigation led to appellant by Williams' statements. The detective then obtained a coat and hat from appellant's girlfriend at the end of July 1996, which he showed to Eaton. Eaton immediately recognized the coat and hat and believed that they were actually the coat and hat the man had been wearing. He then showed her a photo array and she immediately and confidently identified appellant's picture as the man she had seen.
Forrester further testified that appellant sent him a letter postmarked August 2, 1996 in which he made certain factual assertions. The detective checked out the accuracy of these assertions and concluded that there were inconsistencies. He also interviewed another witness who claimed that Spivey and others were in the area that night and almost shot him accidentally because he thinks he looks like Cunningham. This witness did not testify at trial.
In his first assignment of error, appellant argues that the trial court erred when it denied his motion to suppress the testimonial evidence of Norma Eaton. Appellant made an oral motion to suppress, but waived oral arguments. Therefore, appellant's original basis for the motion is not known. On appeal, appellant argues that Eaton's testimony was unreliable because she only saw the man running past her for a few seconds, she could only vaguely describe him, she was not paying attention because she had other things on her mind at the time, and the delay between the crime and the photo array was over five months. In his reply brief, appellant also argues that the photo array was unduly suggestive because it was presented to Eaton after she had identified the coat and hat of the man she had seen.
If an out-of-court identification process violated the defendant's due process rights, any in-court identification by the same person must be excluded unless the state can establish by clear and convincing evidence that the witness had an independent recollection and observation of the defendant. State v. Lathan
(1972), 30 Ohio St.2d 92, paragraphs one, two, and three of the syllabus. Photographic identification procedures are permitted even though there is some possibility of misidentification.Simmons v. United States (1968), 390 U.S. 377, 383-384. The due process clause of the United States Constitution only prohibits unnecessarily suggestive identification procedures which could lead to irreparable misidentification. Stovall v. Denno (1967),388 U.S. 293, 301-302. However, even if the photographic identification process was unduly suggestive, that finding does not automatically require that the identification testimony be excluded nor does it bar a subsequent proper identification.Manson v. Brathwaite, (1977), 432 U.S. 98, 113-114. The identification must also be unreliable under the totality of the circumstances because there was a "very substantial likelihood of irreparable misidentification." Id. at 116, citing to Simmons v. United States, supra at 384;Neil v. Biggers (1972), 409 U.S. 188, 199-200; andState v. Waddy (1992), 63 Ohio St.3d 424, 438-440, certiorari denied (1992), 506 U.S. 921. Several factors should be considered when evaluating the reliability of the identification testimony, including the witness's: (1) opportunity to view the criminal at the time of the crime; (2) degree of attention; (3) accuracy of the description; and (4) level of certainty; and (5) the time between the crime and the confrontation. Manson v.Brathwaite, supra, at 114; Neil v. Biggers, supra, at 199-200;State v. Keith (1997), 79 Ohio St.3d 514, 523, certiorari denied (1998), 523 U.S. 1063.
Each case will necessarily be decided on its own facts.Neil v. Biggers, supra, at 193. The jury may still weigh the accuracy of the identification in light of the suggestive nature of the identification procedure. Manson v. Brathwaite, supra, at 113, fn. 14.
At the hearing on the motion to suppress, the following evidence was presented. Forrester testified that he interviewed Eaton in connection with his investigation after receiving information from Ouida Gordon that a woman named Tessie or Tootsie was standing on the corner at the time of the murder. His investigation finally led to Eaton, known as Tootsie Roll. He interviewed her first on March 2, 1996. Eaton told Forrester the same facts she testified to at trial. She described the man as "thick," muscular, black, shorter than six feet two inches, medium to light complexion, around thirty years of age, wearing a black leather hat with a bill and a mid-length black leather coat. Eaton denied being intoxicated or on drugs at the time.
Forrester met with Eaton again on March 15, 1996 at her home. At the time, he had a lead that the victim had cheated a man nicknamed Dee Dee in a drug deal. So, he had put together a six-page photo array including a suspect with the nickname of Dee Dee. She looked over the pictures for a few minutes, but was certain that the man she had seen the night of the murder was not included. Forrester also asked her if she knew another man who might also have the same nickname. He brought her one picture to determine if she knew the man. She indicated that she knew him and that his name was Dee Dee, but that he was not the man she had seen the night of the murder. On July 31, 1996, Forrester met with Eaton again. In the interim, he had received information linking appellant to the crime. During a consent search of his appellant's girlfriend's home, the police had recovered a black coat and hat matching Eaton's description. Forrester first showed Eaton the coat and hat, and she said it was definitely the coat and hat. He then showed her an eight-picture photo array containing the picture of appellant. In less than five seconds, Eaton identified appellant's photograph as the man she had seen the night of the murder. She did not know the man personally.
At the conclusion of the hearing, the court determined that the police did not employ any impermissibly suggestive identification procedure and that Eaton had an independent recollection based upon her viewing of appellant.
Appellant first argues that the identification process in this case was unduly suggestive because the police first showed the witness the clothing and then the photo array. Appellant argues that the witness was, therefore, improperly influenced to believe that the suspect's picture would be included in the array. We disagree. The detective did not tell Eaton that the police had a suspect in custody nor how he had obtained the clothing. Any inference that Eaton could have made from the presentation of the clothing and then the photo array would have been no greater than an inference arising from the presentation of a photo array in the first place. Eaton would have expected that any photo array would include a picture of the man she had seen. This case is not similar to those where a one-on-one confrontation followed a suggestion by the police that they had a suspect in custody.
Having found that the identification process was not unduly suggestive, we need not reach the issue of whether the identification was nonetheless reliable. Appellant's first assignment of error is found not well-taken.
In his second assignment of error, appellant argues that the trial court erred by admitting the out-of-court identification of appellant by Sheila McNeal who could not identify him at trial. Appellant argues that McNeal's out-of-court identification was not reliable. In his reply brief, appellant asserts that McNeal's testimony should have been excluded because it was irrelevant or should have been excluded because of the confusion it could present to the jury because of its relevance.
Appellant did not object to the admission of McNeal's testimony at trial on any basis. Any error to which the defense has not objected is deemed waived unless it constitutes plain error. Plain error is defined in Crim.R. 52(B) as error which affects a substantial right. It is further defined by the courts as error which denied the accused a fair trial, where the circumstances in the case were exceptional and a reversal of the conviction must be necessary to prevent a manifest miscarriage of justice. State v. Stojetz (1999), 84 Ohio St.3d 452, 455, certiorari denied (1999), 68 U.S.L.W. 3310, 145 L.Ed.2d 376,120 S.Ct. 455; State v. Underwood (1983), 3 Ohio St.3d 12; and Statev. Landrum (1990), 53 Ohio St.3d 107, 111, certiorari denied (1991), 498 U.S. 1127. In the case before us, appellant has not demonstrated that plain error occurred because he has failed to show that he would have been acquitted if McNeal's testimony had not been admitted. Appellant's second assignment of error is not well-taken.
In his third assignment of error, appellant argues that his conviction was contrary to the manifest weight of the evidence. A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the conviction than not. State v. Thomas (1997), 77 Ohio St.3d 323,326, and State v. Smith (1997), 80 Ohio St.3d 89, 113, certiorari denied (1998), 523 U.S. 1125.
Upon a review of all of the evidence in this case as a whole, we find that the manifest weight of the evidence supports appellant's convictions. We cannot find any basis for concluding that the jury clearly lost its way or that a manifest miscarriage of justice occurred.
Appellant points to the fact that the testimonies of the witnesses were contradictory as to whether appellant knew Cunningham and how many shots were heard that morning. Furthermore, Williams' credibility was questionable in light of other evidence that was submitted. He believes that Eaton's testimony was also not credible because she could not understand the diagram used at trial to explain where she was standing in relation to the man she saw. She also could not give a detailed description of the man.
Upon a review of all of the evidence, we find that while there is inconsistent testimony and credibility is at issue, the evidence was not of such a character that a reasonable jury could not sort through the evidence and determine appellant's guilt or innocence. Even though Eaton and McNeal did not have the mental capacity to understand the map diagram drawn by the prosecution, they were capable of telling what they were doing that evening and what they saw and heard. Furthermore, Pierson's and Gordon's testimonies connect appellant to Cunningham and provide a motive for the crime. The fact that one witness's testimony may not be credible does not prevent a reasonable jury from concluding that appellant is guilty of the crime charged. We find that the jury's verdict was not contrary to the manifest weight of the evidence.
Accordingly, appellant's third assignment of error is not well-taken.
In his fourth, fifth, and sixth assignments of error, appellant argues that the court erred by denying his motion for a new trial. In his fourth assignment of error, appellant alleges that the trial court should have granted him a new trial on the basis that the state's primary witness recanted his testimony.
Crim.R. 33(A)(6) provides that a new trial may be granted on the ground of newly discovered evidence. Furthermore, the Ohio Supreme Court has held that such new evidence cannot merely contradict the former evidence. State v. Petro (1947),148 Ohio St. 505, syllabus. Therefore, evidence that a key witness for the prosecution gave false testimony at trial does not automatically warrant a new trial. State v. Bradley (1995),101 Ohio App.3d 752, 758. However, contradictory evidence can be grounds for a new trial if it creates a strong probability that the outcome of the trial would have been different. Dayton v.Martin (1987), 43 Ohio App.3d 87, 90. With respect to cases where a significant witness recants his trial testimony, the trial court must determine whether the original testimony or the recantation is most credible and then whether the witness's testimony could have affected the outcome of the trial. State v. Pirman (1994),94 Ohio App.3d 203, 209; Toledo v. Easterling (1985), 26 Ohio App.3d 59,61; and State v. Curnutt (1948), 84 Ohio App. 101,111-112.
Since the determination of whether or not to grant the motion for new trial is a matter within the discretion of the trial court, its ruling will not be disturbed on appeal without a showing of an abuse of discretion. State v. Schiebel (1990),55 Ohio St.3d 71, paragraph one of the syllabus, and Toledo v.Easterling, supra. An abuse of discretion is shown only by establishing that the decision was unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
Appellant moved for a new trial based upon the affidavit of Williams, who attested to the fact that he was threatened by Forrester to testify against appellant or be implicated in the crime; that he had no knowledge of appellant's involvement in the crime; that his testimony was rehearsed with the prosecutor; and that he was promised to be released from prison if he cooperated with the prosecution.
However, at a hearing on the motion, Williams refused to testify by asserting his Fifth Amendment privilege. Forrester testified that he never threatened Williams and that he only told him to tell the truth. Forrester further testified that Williams contacted the detective and implicated appellant in the crime before the detective promised to write a letter to the parole board. The detective never promised to help Williams get out on parole because he could not have made that happen. Forrester only promised to send the parole board a letter stating that he had cooperated with the prosecution and testified at trial without any personal benefit.
Finally, Forrester and another detective testified that Williams contacted them the morning of the hearing. He informed Forrester that Williams signed the affidavit because he was mad at the prosecutor since testifying did not aid his parole. However, he did not want appellant to get out because of him. Williams indicated that he was afraid that appellant was making arrangements to have him harmed.
The trial court concluded that Williams' recantation of his testimony was not credible because he was motivated to recant his testimony by his fear of appellant and his inability to obtain parole and because he recanted his affidavit that he had lied the morning of the hearing on the motion for a new trial. In addition, the court held that even if Williams' trial testimony was false, it did not materially affect the outcome of the trial.
On appeal, appellant has failed to establish that the trial court abused its discretion in finding that Williams' recantation was not credible or that his trial testimony, if false, materially affected the outcome of the trial. Upon a review of the facts of this case, the trial court's conclusions are reasonable. Appellant's fourth assignment of error is not well-taken.
In his fifth and sixth assignments of error, appellant alleges that the trial court should have granted him a new trial on the basis that the state's action of failing to disclose its agreement with Williams and putting on evidence it should have known was perjured constituted misconduct. First, we note that the second basis for a new trial (that the prosecution knowingly presented Williams' false testimony to the jury) was not raised below and, therefore, is waived for purposes of appeal. Nonetheless, even if we did address it under a plain error standard, we would hold that it has no merit since the trial court held that Williams' recantation was not credible and we affirmed that decision in the prior assignment of error.
We now turn to the issue of whether the prosecution should have revealed to the defense its promise to Williams to send a letter to the parole board informing them of his cooperation in this trial. Crim.R. 33(A)(2) provides that a new trial may be granted on the basis of misconduct by the prosecutor.
In Brady v. Maryland (1963), 373 U.S. 83, the United States Supreme Court declared that the Due Process Clause of theFourteenth Amendment to the United States Constitution requires that the prosecution notify the defense of any evidence which would tend to exculpate him. Evidence which solely relates to the credibility of a prosecution witness falls within this rule as well. Giglio v. United States (1972), 405 U.S. 150 and Napue v.Illinois (1959), 360 U.S. 264.
The trial court concluded that the prosecutor's promise to write to Williams' parole board to inform them of his cooperation in this trial did not affect Williams' credibility because it was not the type of promise encompassed by the Napue
rule. Other courts have held similarly. McCleskey v. Kemp (C.A. 11, 1985), 753 F.2d 877 (prosecutor would "speak a word" on behalf of the witness); Depree v. Thomas (C.A. 11, 1991), 946 F.2d 784
(detective promised to "take care of" the witness); and State v.Seiber (Sept. 2, 1993), Cuyahoga App. No. 63717, unreported (prosecutor promised to look into having the witness's probation transferred because of the problem testifying might cause); andState v. Byrd (Feb. 26, 1992), Hamilton App. No. C-910340, unreported (prosecutor promised to send a letter like the one in the case before us). In the Byrd case, the court concluded that evidence that the prosecutor promised to send such a letter was not evidence of any consideration given for the witness's testimony.
However, the trial court held that any type of consideration promised by the prosecutor in exchange for a witness testimony must be disclosed to the defense because of its possible effect on credibility. We agree.
The trial court concluded, however, that even though the prosecution should have disclosed its promise to the defense, a new trial was not warranted in this case because there was no reasonable probability that the jury would have acquitted appellant if it had known of the promise and believed that Williams was not credible. The testimony of Eaton, Gordon, Pierson, and McNeal and the physical evidence presented were sufficient on their own to support appellant's conviction. Williams' testimony merely corroborates or supplements the other evidence presented. It was not the "linchpin of the State's case" as appellant suggests. Therefore, we find that the trial court did not abuse its discretion by denying appellant's motion for a new trial. Appellant's fifth and sixth assignments of error are not well-taken.
Appellant concedes in his brief that his seventh assignment of error does not have merit and, therefore, we interpret his statements as meaning that he withdraws this assignment of error.
Appellant argues in his eighth assignment of error that the trial court erred by allowing the state to make improper remarks during closing arguments. He contends that the prosecutor improperly used mathematical probability language to evaluate the evidence. During his rebuttal closing argument, the prosecutor examined each witness's testimony and then attempted to calculate the probability that Eaton would identify appellant, who possessed a coat and hat matching her description, knew Cunningham, and had a recent disagreement with him.
When considering a claim of prosecutor misconduct, we must first determine whether the statements were improper. Statev. Cornwell (1999), 86 Ohio St.3d 560, 570-571. Second, we must determine whether the statements "prejudicially affected the substantial rights of the accused" and denied him a fair trial.Id., and State v. Apanovitch (1987), 33 Ohio St.3d 19, 24.
We need only reach the first prong of the test because we find that the prosecutor's statements were not improper. He was attempting to point out that the probability of appellant being wrongfully accused was slim. When determining whether the evidence established the defendant's guilt beyond a reasonable doubt, the jury naturally weighs the probabilities that the evidence is true. State v. Jenks (1991), 61 Ohio St.3d 259,265-266, quoting Holland v. United States (1954), 348 U.S. 121,139-140. However, the jury may only convict a defendant if his guilt is proven beyond a reasonable doubt, beyond a mere probability of guilt. The prosecutor and the court clearly stated this standard for the jury. Therefore, we find appellant's eighth assignment of error not well-taken.
In his ninth assignment of error, appellant argues that the trial court erred by admitting into evidence the testimony of Pierson regarding a .25 caliber automatic pistol. Pierson testified that he observed a .25 semiautomatic pistol under the front seat arm rest in appellant's car. Pierson also testified that appellant admitted that he would always carry a gun even though he was under a disability to possess a firearm. Appellant contends that the evidence was irrelevant, since other evidence indicated that a higher caliber weapon was the murder weapon, and highly prejudicial, because it informed the jury of appellant's prior criminal record and created an inference that it was the missing murder weapon.
First, we disagree with appellant's contention that other evidence indicated that a higher caliber gun was used to kill Cunningham. While two witnesses testified that the murder weapon could have been a higher caliber weapon, they admitted that they had no facts upon which to substantiate their guess. Therefore, we find that evidence that appellant carried a weapon was relevant. It tended to prove either that he had a weapon which could have been the murder weapon or at least that he knew how to use a gun and obtain a weapon while under a disability.
However, under Evid.R. 402 and 403(A), even relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, * * *." The determination of whether evidence should be admitted or excluded under this rule is left to the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, we will not disturb the trial court's holding unless it was unreasonable, arbitrary, or unconscionable abuse of the court's discretion. State v. Maurer (1984), 15 Ohio St.3d 239,264-265, certiorari denied (1985), 472 U.S. 1012.
We find that appellant has failed to establish that the trial court abused its discretion. Any possible unfair prejudice arising from the introduction of this evidence was substantially outweighed by the probative value of the evidence. Therefore, appellant's ninth assignment of error is not well-taken.
In his tenth assignment of error, appellant argues that the cumulative effect of the errors that occurred at trial denied him a fair trial. Having found that the previous nine assignments of error did not have merit, there is no cumulative effect. Therefore, appellant's tenth assignment of error is not well-taken.
Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 __________________________________________ PETER M. HANDWORK, J., JUDGE
 ________________________________________________ RICHARD W. KNEPPER, P.J., JUDGE CONCUR.
 ____________________________________________________ JAMES R. SHERCK, J., dissents and writes separately.