## Richmond

WILLIAM RAY FOUT, JR. AND JENNINGS COFFEY v. COMMONWEALTH
OF VIRGINIA.

June 14, 1957.

Record No. 4655.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Whittle and Snead, JJ.

The opinion states the case.

*Clyde B. Lanham* and *T. W. Messick*, for the plaintiffs in error.

*Thomas M. Miller, Assistant Attorney General (J. Lindsay Almond, Jr., Attorney General*, on brief), for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

This case arises out of an offense committed on the night of December 24, 1955, when the Owen-Weaver Sporting Goods Store, in the City of Roanoke, was broken into and $2,684.89 worth of guns and ammunition and two cameras were stolen therefrom. William Ray Fout, Jr., Jennings Coffey and Clarence Robert Hall were charged with the crime and jointly indicted for statutory burglary and grand larceny. Hall elected to be tried separately, and upon his trial he was convicted by a jury on April 24, 1956. His punishment was fixed at seven years in the penitentiary. Upon appeal, we reversed for insufficient evidence of his guilt. *Hall* v. *Commonwealth*,

198 Va. 676, 96 S. E. 2d 100. Fout and Coffey were jointly tried and convicted by a jury on April 26, 1956. The punishment of each was fixed at eight years in the penitentiary. Abie Hasson was also separately indicted for the same offense. He was tried on April 27, 1956, and the trial court, being of the opinion that the evidence was insufficient to convict him, sustained a motion to strike.

In the present case, Fout and Coffey assign four grounds of error to their judgment of conviction. The first ground is that the verdict is contrary to the law and the evidence, and without evidence to support it. The second is that their conviction is based upon false and perjured testimony. The third relates to the granting of two instructions, and the fourth consists of what is termed a supplemental assignment alleging misconduct of the jury. A discussion of the first two assignments of error requires a review of the evidence, which is, in many respects, the same as in *Hall* v. *Commonwealth, supra.*

On February 11, 1956, about 3:00 p. m., S. M. Lynch, Deputy Sheriff of Roanoke County, while on highway patrol duty, heard a shot fired and some loud voices in a wooded area in Roanoke County, about three miles south of the City of Roanoke. Lynch drove off the main highway on a road leading into the wooded area. Upon investigation, he found, on a roadway used as a trail, a 1949 Mercury automobile belonging to Fout. He heard a loud voice exclaim, "I know he went this way and he came back down the road." Lynch stopped by the side of the Mercury. In a short time Fout walked within ten feet of that automobile carrying a plastic bag. Coffey approached about fifteen feet behind Fout carrying a .22 rifle. Lynch asked Fout what he was looking for. Fout replied, "Nothing—just looking." Asked where he got the plastic bag, Fout said he found it in the woods. In the meantime, the approaching Coffey threw the rifle from his hand to the ground, reached into his pockets, pulled out two pistols and also threw them to the ground. Lynch placed both men under arrest. He directed them to walk back to the place "where you throwed the guns down." Coffey asked, "What guns?" The deputy sheriff then searched Fout but found nothing on him. When he searched Coffey, he found an unloaded .22 automatic Italian pistol in the latter's right-hand pocket.

Lynch asked the two men if they wanted to tell where they got the guns. Coffey stated that "I am not telling you anything," but that he would talk to Paul Vest, a Roanoke City Detective. Lynch called the Roanoke City Police Department, and several officers, in-

cluding Paul Vest, came out to the wooded area and there Lynch turned the defendants over to them. Lynch testified that there had been a light rain, and that the plastic bag was "wet and all stuck together," that the guns had rusty spots on them, and it appeared to him that they had been out in the woods some little time.

Frank Scales, a young Negro, a resident of Pulaski, Virginia, and a recent inmate of the city jail, testified that he had shortly before Christmas, 1955, ridden into Roanoke three times with Abie Hasson, in the latter's blue Oldsmobile; that on the first trip, which he thought was shortly before Christmas, around December 21, 1955, they were accompanied by Clarence Robert Hall; that upon their arrival at the "market" in Roanoke, Hall met his wife, and he and Hasson left him there; that on the following day he, Hall, and Jennings Coffey rode in the same automobile to Roanoke; that on arriving in Roanoke they drove into a driveway between the Owen-Weaver Store and an A. B. C. Store about one o'clock p. m.; that Hall got out of the car in the driveway, walked towards the sporting goods store, returned in about five minutes, and said, "Well, the job was cased;" that all of them then got in the car and "started talking about tools—that included all of them;" that the four of them went to Salem, and thence four or five miles beyond Salem where Hasson and Coffey went to a restaurant; that Hall then drove to a place called "Casa Loma;" that they left there, and next stopped in front of a "white house," where Hall got out of the car, went in the house, and stayed about forty-five minutes; that they then "picked up" Hasson and went back to Pulaski; and that he later found out that Fout lived in the "white house," visited by Hall.

Scales said that again on the following day, about December 23, 1955, he, Hall, Coffey and Hasson went to Roanoke; that he, Scales, got out at Henry Street; that the other three talked about getting some crowbars and rollers; and that Hall said that he had seen Fout, and that "they wouldn't have this worry about any numbers because Fout—he thought Fout could be able to change."

Scales further said that after Christmas, he saw the defendant, Coffey, in Pulaski, in his red maroon Ford or Mercury, with about fifteen guns in his automobile. He had some difficulty in fixing the exact date, but upon further examination, he was quite positive that the day was Christmas day, because Coffey greeted him on the morning of that day, in Pulaski, saying, "Frank, come up to my house, I got your Christmas present;" that it was between seven and eight

o'clock, and Coffey gave him three one-dollar bills; and they drove off in a cab to the place where Coffey said he had spent the night before. He admitted that he had formerly said that there were about thirty guns in the car. He was quite sure that there were more than fifteen.

One of the owners of the sporting goods store testified that the guns recovered by Deputy Sheriff Lynch, bearing serial numbers, were among those stolen on the night of December 24th, at the time of the break-in; that he had seen Hall in his store on two occasions during the week before Christmas; that on one occasion Hall asked to use the rest room, but after being specifically directed to the left door thereto, he went to the right door, which led to the back of the store; and that the entry into the store on the night of December 24th was made by prying open the back door and impressions upon that door indicated a crowbar had been used.

Captain K. E. Allman, of the Roanoke Police Force, testified that Fout told him that he had gone into the wooded area, where Lynch found the guns, with Coffey to take a drink because he did not want to be seen in Roanoke with Coffey; that he heard Fout tell his wife not to make any statements and not to forget that he was at home Christmas Eve; and that Mrs. Fout later told him that Fout and Coffey were together Christmas Eve and had gone out but she did not know where they went or how long they were gone. He also said Fout told him that he did not see Coffey with the guns.

Steve Shelton, a State Police Investigator, said Fout told him that he was with Coffey on Christmas day, on which day they went to Pulaski and got Hasson.

Police Officer R. L. Moore testified that on the night of the arrest of Fout and Coffey at the latter's home, Coffey told his wife "You stay at home, and keep your damn mouth shut and don't come to headquarters;" and that when he was told of the cause of his arrest, Coffey said, "I don't care what rap you got, I can beat it."

Fout testified, but Coffey did not take the witness stand. Fout said that he went to the wooded area to secure some information about stolen property for the police department; that he had not been there for nine or ten years; that he and Coffey were examining the guns when the officers came upon them, and that they found the guns on the down-side of the road, with the plastic bag nearby. On cross-examination, he said he was at Coffey's house on Christmas Eve; that he did not go to Pulaski with Coffey on Sunday; that his auto-

mobile was at Coffey's house when the officers arrived on December 27th; and that certain tools, which the officers found in his car, and referred to as a sledge hammer, or a small crowbar, and a "maul hammer," were, in fact, tire or working tools for his car. He denied he had told the officer that he did not see the guns in the woods.

The defendants then presented a number of witnesses, who testified that the defendants were in a place other than that described as the place where the crime was committed at the time of its commission. Mrs. Fout said her husband was at home on Christmas Eve night after eight-thirty p. m. The wife and mother of Coffey both testified that Coffey was at his home on Christmas Eve and slept there that night. The wife of Coffey admitted, however, that Fout was at their home on Christmas Eve. There was also testimony on behalf of the defendants that Coffey was at his place of work in Botetourt County during the week days prior to Christmas, 1955, and there was evidence contradictory to that of the Commonwealth with reference to the automobile alleged by Scales to have been used on his trips with Hasson to Roanoke.

The evidence showed that Fout and Coffey were more or less intimate friends, and that they and their families visited each other in their respective homes. Fout was a steel worker, and Coffey was employed at a cement plant. Coffey and his family lived in Roanoke in the home of his mother, and Fout lived just outside of the corporate limits of the City of Roanoke.

At the conclusion of the evidence, the court overruled the motion of defendants to strike the evidence on the ground that the Commonwealth had not made out a case. The jury was then instructed, four instructions being given at the request of the Commonwealth and nine at the request of the defendant. Upon a return of the verdict fixing the punishment of each of the defendants at confinement in the State Penitentiary for eight years, sentence was imposed accordingly.

On May 4th, eight days later, the defendants moved the court to set aside the verdict, and grant them a new trial, which motion the court took under consideration, and later overruled on May 16, 1956.

The guilt of one breaking into a building may be established by circumstantial evidence. Direct testimony on the part of someone who saw him in the commission of the act or near the scene of the crime is not necessary, and it is unusual in cases of this character. *Wilborne* v. *Com.*, 182 Va. 63, 66, 28 S. E. 2d 1.

The question we often have to decide is whether the unexplained possession of goods recently stolen from a building, and the actions and explanations given by the possessor of the stolen goods, together with the additional evidence are sufficient to justify a jury in finding that he is guilty of housebreaking.

The rule of law applicable in a prosecution for burglary or housebreaking has been set forth many times by this Court. In *Miller* v. *Commonwealth*, 185 Va. 17, 21, 37 S. E. 2d 864, we approved the following statement from *Gravely* v. *Commonwealth*, 86 Va. 396, 400, 10 S. E. 431, where it was said:

"Viewed in this light, the verdict must stand.

"It is a general rule of the common law, with regard to the evidence in cases of larceny, that the possession of goods recently stolen is *prima facie* evidence of guilt, and throws upon the accused the burden of accounting for that possession. This rule, it is true, has never been held by this court to apply with the same effect in cases of burglary or housebreaking, and the decided weight of authority is that it does not. Still, where goods have been obtained by means of a burglary or house-breaking, the fact of such possession is a most material circumstance to be considered by the jury, and where, in addition to such possession, other inculpatory circumstances are proved, such, for example, as the refusal of the accused to give any account, or his giving a false account, of how he came by the goods, such proof will warrant a conviction. In other words, to use the language of the books, there should be some evidence of guilty conduct, besides the bare possession of the stolen property, before the presumption of burglary or housebreaking is superadded to that of larceny, but extrinsic mechanical indications may constitute such additional evidence." (Citing cases.)

The above doctrine was affirmed in *Drinkard* v. *Commonwealth*, 163 Va. 1074, 178 S. E. 25, where, at page 1083, this was said:

"But when evidence has been introduced, which, if believed, establishes that a house has been broken and entered and goods stolen therefrom, and warrants an inference beyond a reasonable doubt that the breaking and entering and the larceny of the goods were committed at the same time, by the same person or persons, as a part of the same transaction, upon principle and authority, the exclusive possession of the stolen goods shortly thereafter, unexplained or falsely denied, has the same efficiency to give rise to an inference that the possessor is guilty of the breaking and entering as to an in-

ference that he is guilty of the larceny. In such a case the rules, with reference to whether the possession proven is sufficient to warrant an inference beyond a reasonable doubt that the possessor is guilty of the breaking and entering with intent to commit larceny, are practically the same as those applying with reference to whether it is sufficient to warrant an inference beyond a reasonable doubt that the possessor is guilty of the larceny." *Myers* v. *Commonwealth*, 132 Va. 746, 760, 111 S. E. 463; *Williams* v. *Commonwealth*, 193 Va. 764, 770, 771, 71 S. E. 2d 73; 3 M. J., Burglary and Housebreaking, § 15, pages 645 and 646; 9 Am. Jur., Burglary, sections 74, 75, and 76, pages 276 *et seq.;* 12 C. J. S., Burglary, § 45, pages 716 *et seq.*

■ The evidence of the storeowner and police officers, in this case, established the commission of the crime charged, and thus the *corpus delicti* was proven. It is not questioned that the breaking and entering and the larceny of the goods were committed at the same time. Shortly thereafter a part of the stolen goods was found in the joint and exclusive possession of Fout and Coffey. *Castle* v. *Commonwealth*, 196 Va. 222, 227, 83 S. E. 2d 360.

The defendants gave strange, fantastic and conflicting statements in explanation of their presence where the guns were found, and the reason for their possession. Fout, at first, denied knowledge of the guns. Then he changed his story, and said they were found in the woods. One time he said he went to the woods to take a drink, and on another occasion that he was searching for the guns at the request of the police.

According to the witness, Scales, Coffey was present when the storehouse was "cased;" Coffey went to see Fout and reported that Fout could change the serial numbers on the guns; and Coffey was in possession of a number of guns in Pulaski on or about Christmas day. Fout said that he did not go to Pulaski with Coffey on Christmas day, but Officer Shelton testified that Fout told him that he did go there with Coffey on that day. There were inconsistencies in the testimony of the wife of Fout with reference to the whereabouts of Fout and Coffey on the night of Christmas Eve.

The evidence of the Commonwealth, the admissions and contradictions of the defendants, and the circumstances related, both prior and subsequent to the commission of the crime, constituted material circumstances to be considered by the jury in determining whether the defendants were guilty of the crime charged against them.

[■ Defendants contended that the court should have set aside the

verdict against them because Frank Scales, in the subsequent trial of the case against Abie Hasson, testified on cross-examination that he was mistaken when he testified on direct examination that Coffey was present on the trips to Roanoke in December, 1955. The evidence of Scales, in the Hasson case, presented in the record in this case, discloses that Scales did give such contradictory testimony; but that when he was later recalled to the witness stand he reaffirmed his first testimony that Coffey was present on all of the three trips to Roanoke, and explained that he had changed his testimony on cross-examination because threats were made by Hasson and his friends against him, Scales, while in jail.

We answered a similar contention adversely to the defendant, Hall, in *Hall* v. *Commonwealth*, 198 Va. page 676, citing *Powell* v. *Commonwealth*, 133 Va. 741, 112 S. E. 657, 33 A. L. R. 541, where the applicable principles were stated and applied, and *Lewis* v. *Commonwealth*, 193 Va. 612, 625, 70 S. E. 2d 293. We repeat what we said in *Lewis* v. *Commonwealth, supra*, at page 625:

"While discovery after trial, brought to the attention of the court in due time, that false testimony with respect to material facts has been given by a witness for the prosecution may constitute ground for a new trial, recantation by a State's witness does not necessarily entitle the accused to a new trial. The opportunity and temptation for fraud are so obvious that courts look with suspicion upon such an asserted repudiation of the testimony of a witness for the prosecution, and this is so even though the repudiation be sworn to. For a collection of cases on the subject see 39 Am. Jur., New Trial, § 169, pp. 175, 176; Annotations: 33 A. L. R. 550, 74 A. L. R. 757, 158 A. L. R. 1062.

"Deducible from the authorities are these principles: There must be clear and convincing proof that the witness testified falsely at the trial, and not merely proof that by reason of conflicting statements his testimony is unworthy of belief. Application for a new trial is addressed to the sound discretion of the trial court which has the opportunity of seeing and hearing the witness whose testimony is brought under attack, and the prime duty of determining whether he swore falsely at the trial. A new trial will not be ordered where it appears that, eliminating the disputed testimony, there remains sufficient evidence to sustain the verdict."

We do not think that the court abused its discretion in refusing to grant a new trial on this ground.

Counsel for the defendants rely upon the case of *Hall* v. *Commonwealth, supra,* and earnestly argue that there was nothing to connect Fout with the crime except for the guns found on the mountainside; that instruction B, given at the request of the Commonwealth, was erroneous; and that Coffey did not attempt to establish an alibi, and, therefore, instruction D was erroneous as to him.

Proof of a material fact was lacking in *Hall* v. *Commonwealth, supra.* While the evidence created a strong suspicion of the accused's guilt, it was not shown that he had possession of any of the stolen property at any time. Here it is undisputed that Fout and Coffey had exclusive possession of four guns on the mountainside, and there is evidence that Coffey had a larger number in his automobile on December 25, 1955.

In their brief and argument, the defendants contend that the trial court erred in giving instruction B, which reads as follows:

"The Court instructs the jury that if you believe from the evidence in this case beyond a reasonable doubt that Owen-Weaver Company, Incorporated, was broken and entered and the goods in question were guns taken from the Owen-Weaver Company, Incorporated, and that the breaking and entering and larceny was all a part of the same transaction, that is, committed at the same time and by the same persons, and that the property or a part of the property taken has been found in the exclusive possession of the defendants, then the persons found in exclusive possession are presumed to be the persons who committed the breaking and entering and larceny, and requires evidence giving a reasonable explanation of how they came in possession of such goods and should the evidence fail so to do, the presumption of being the persons who broke and entered and committed larceny remains and they are presumed to have committed the crime of breaking and entering and committing larceny."

The Commonwealth contends that the instruction is justified by what we said in *Drinkard* v. *Commonwealth, supra,* 163 Va. at page 1074. Defendants claim that it erroneously states the rule of law applicable to the facts of this case, especially with regard to the presumption said to be created. We do not approve instruction B as granted. It would have been better had the court given, in lieu thereof, an instruction which followed more closely the principle stated in *Drinkard* v. *Commonwealth, supra.* Instead of instructing the jury that if they believed the stolen property had been found in the exclusive possession of the defendants, under the circumstances

stated, then they "are presumed to be the persons who committed the breaking and entering and larceny, and requires * * *," it would have been better if the court, in lieu thereof, had told the jury, substantially, that if they believed the recited circumstances had been established and the exclusive possession of the stolen goods shortly thereafter had been unexplained or falsely denied, this was sufficient to raise an inference that the defendants were guilty of the breaking and entering, and that if such inference, taking into consideration the whole evidence, warranted a belief beyond a reasonable doubt that the defendants committed the offense charged, then it was the duty of the jury to find them guilty.

However, since no exception to the instruction was taken at the time it was given, we cannot now consider the subsequent assignment of error. Rule of Court 1:8.

█ We find no error in instruction D, which reads as follows:

"The Court instructs the jury that where the State has established a *prima facie* case and the defendant relies upon the defense of alibi, the burden is upon him to prove it, not beyond a reasonable doubt nor by a preponderance of the evidence but by such evidence and to such a degree of certainty as will, when the whole evidence is considered, create and leave in the mind of the jury a reasonable doubt as to the guilt of the accused."

It will be noted that instruction D merely states that "where the State has established a *prima facie* case," the stated rule applies. A *prima facie* case is one which is established by sufficient evidence, which, if not rebutted, remains sufficient. The circumstances under which the guns were found in the possession of the defendants, the time, the place, their conduct, their account of the possession, and other inculpatory circumstances proven, were sufficient to warrant an inference of the defendants' guilt of the housebreaking and larceny charged, and put the burden on the defendants to produce evidence, considered with the whole evidence of the case, sufficient to create and leave in the mind of the jury a reasonable doubt of their guilt.

█ The ground of the "supplemental assignment of error," alleging misconduct of the jury, does not appear to have been brought to the attention of the trial court, until May 4, 1956, eight days after judgment had been entered and the defendants sentenced to imprisonment thereunder. It is based upon the following facts and circumstances:

The jurors were specifically instructed on their *voir dire* not to read or discuss anything about the verdict and proceeding in the Hall case. Hall, it will be remembered, was tried and convicted on April 24, 1956, while this proceeding was begun on April 24th and concluded on April 26, 1956. Upon the return of the jury's verdict herein on April 26th, each of the jurors was polled and each replied that the verdict returned was his verdict. Asked later by defendants' counsel if any of them knew of or had discussed the verdict rendered in Hall's case, several jurors stated that they had heard of the result in that case before they had agreed on their verdict as to Fout and Coffey.

It appeared that on April 25th, while the jurors were descending the steps of the Court House, a man named Farmer, one of the witnesses in this case, standing in the street, was asked by another man across the street if he, Farmer, "was in this trial," and Farmer said "Yes." The other man "hollered" that he heard Hall got a seven-year sentence. One of the jurors said that he heard the sentence mentioned in the jury room, but not before, and that it had nothing to do with the verdict in this case. The court asked the jurors whether their verdict as to Fout and Coffey was influenced by the fact they had heard something about the Hall case and the sentence there imposed. The jurors said, in unison: "No, sir." The court then asked whether they had decided this case strictly on the law and the evidence presented therein. They replied, in unison, "Yes, sir." When asked if all confirmed the latter answer, they replied, in unison, "Yes, sir." Thereupon the court approved the verdict of the jury, and immediately entered judgment against the defendants accordingly. The record does not contain any objection by either of the defendants to the above procedure either at the time of its occurrence or before the entry of the judgment and imposition of sentence.

On the whole case, we cannot say that the jury's verdict was not justified by the evidence; we do not find any prejudice in the instructions or in the rulings of the court; and accordingly the judgment against each of the defendants is affirmed.

*Affirmed.*