Tuesday                    24th

January, 2006.

In Re: Aleck J. Carpitcher,                                        Petitioner.

Record No. 2755-04-3

Upon a Petition for a Writ of Actual Innocence

Before Chief Judge Fitzpatrick, Judges Elder and Humphreys

Aleck J. Carpitcher ("Carpitcher") petitioned this Court for a Writ of Actual Innocence Based Upon Nonbiological Evidence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia. Carpitcher claims he is innocent of aggravated sexual battery, taking indecent liberties with a minor, and animate object sexual penetration, of which he was convicted in the Circuit Court of Roanoke County on August 30, 1999. Upon consideration of the petition, Carpitcher's memorandum in support of the petition, the Attorney General's response and motion to dismiss, Carpitcher's reply thereto, and the record, this Court remanded the matter to the trial court to certify findings of fact regarding factual issues in dispute. The trial court conducted a hearing in this matter and supplied this Court with its certified findings of fact. Upon consideration thereof, we dismiss the petition for failing to establish previously unknown or unavailable evidence sufficient to justify the issuance of the writ. See Code § 19.2-327.13(i).

I.

On August 30, 1999, a jury convicted Carpitcher of aggravated sexual battery, in violation of Code § 18.2-67.3(A)(1), taking indecent liberties with a minor, in violation of Code § 18.2-370.3, and three counts of animate object sexual penetration, in violation of Code § 18.2-67.2. The trial court imposed a prison sentence of 73 years, with 35 years suspended, resulting in an active sentence of 38

years in prison. Both this Court and the Virginia Supreme Court denied Carpitcher's petitions for appeal.

All of the convictions arose out of Carpitcher's alleged sexual abuse of H.L., the ten-year-old daughter of his then-girlfriend. H.L., who was eleven years old when she testified at the jury trial, stated that Carpitcher—on at least three separate occasions—pulled down her underwear and penetrated her vagina with his finger. H.L. also testified that, on another occasion, she saw Carpitcher urinating, and he told her to come over and touch his penis. H.L. said that she did not tell her mother about these incidents because she had seen Carpitcher act violently towards her mother on at least two previous occasions. H.L. was the Commonwealth's only witness during the trial,[1] and, thus, the jury predicated Carpitcher's convictions solely upon her testimony.[2]

However, in March 2000, H.L. told her therapist—who had been pressing her for details about the sexual abuse—that she had fabricated those portions of her trial testimony dealing with the inappropriate touching. H.L. told the therapist that she created the story because she missed being able to spend time with her mother. Then, in April 2000, H.L.—who was still only eleven years old—wrote a letter to the governor, which reads as follows:

> Governor Gilmore,
>
> Well I guess my Mother has informed you about Aleck Carpitcher & how I [] falsely accused him of wrongdoings. Well I just want to let everyone to know that I <u>am</u> sorry, but as you probably know I was only 9 years of age at the time so I <u>actually</u> <u>really</u> didn't know what exactly I was doing. I just thought that he would go away. I was wrong about that

---

[1] Although H.L. had been seen by a doctor who found physical evidence consistent with penetration of H.L.'s vagina by a finger, the Commonwealth—apparently unaware that the examination had occurred—did not introduce the results of that examination during trial.

[2] There were inconsistencies in H.L.'s statements to the police officers regarding what she was wearing and what was on TV at the time of the alleged incidents. Because Carpitcher's trial counsel decided that he was not going to "beat up" on the victim or "nit pick" at her story, however, these inconsistencies were not brought out during H.L.'s cross-examination. Rather, Carpitcher's sole defense was that he was in Tennessee and Washington D.C. for "almost" the entire month of March, one of the three months during which the abuse allegedly occurred.

though! Well I hope this letter will help you with getting him out of prison. Thank you! Sincerely, [signature]

Later that same month, Carpitcher's trial counsel videotaped a statement by H.L. in which she said that, although Carpitcher had made an inappropriate sexual comment to her, he had never touched her inappropriately. During the interview, H.L. told Carpitcher's trial counsel that she was "coming forward now" because her "mom told [her] if [she] did not [she'd] have to go live with [her] dad and [she] hate[s] living with [her] dad."

On October 30, 2000, H.L. signed a handwritten affidavit in which she stated that her "testimony given in court during the trials against [Carpitcher] was not true . . . [he] did not touch me or do any of the things I said he did." In December 2001, H.L. signed a second affidavit in which she stated that she fabricated her allegations of sexual abuse because she had decided to force an end to Carpitcher's relationship with her mother. In the affidavit, H.L. further stated that her trial testimony was untrue and that she "tried very hard to get him convicted" so that she could return to live with her mother. On at least one occasion after she initially recanted her trial testimony, however, H.L. told her mother that the sexual abuse did, in fact, occur.

On January 3, 2002, based on H.L.'s recantation of her trial testimony, Carpitcher filed a petition for a writ of habeas corpus in the Roanoke County Circuit Court, alleging that he was innocent of the crimes for which he was convicted. During the evidentiary hearing, H.L. testified that Carpitcher never touched her inappropriately, but she maintained that he had once asked her to touch his penis.

In a letter opinion dated August 11, 2003, the circuit court denied the petition for a writ of habeas corpus, holding that Rule 1:1 barred consideration of the actual innocence claim. See Carpitcher v.

Hinkle, 62 Va. Cir. 391, 395 (2003). The Virginia Supreme Court denied Carpitcher's petition for appeal in the state habeas proceedings.[3]

On November 29, 2004, Carpitcher filed in this Court a petition for a writ of actual innocence based upon newly-discovered non-biological evidence, contending that the "newly discovered" evidence was H.L.'s post-trial statement to Carpitcher's attorney, in which H.L. asserted that her trial testimony was untrue. Carpitcher also alleged that H.L. had taken and passed a polygraph examination to "prove" that she had lied at trial and that Carpitcher had never touched her inappropriately.

The Commonwealth filed a motion to dismiss Carpitcher's petition for a writ of actual innocence, alleging that the petition was unwarranted because it was questionable whether H.L.'s recantation was, in fact, truthful. The Commonwealth also proffered an affidavit from Henry Bryant, owner of the home in which Carpitcher, H.L., and H.L.'s mother lived.[4] In the affidavit, Bryant asserts that Carpitcher had once told him that, if H.L. lived on a reservation, she would have already been "broke in"—*i.e.*, would no longer have been a virgin. Bryant also stated that there were occasions during which Carpitcher and H.L. were left alone together.[5]

The Commonwealth also proffered evidence that Carpitcher has a past record of statutory rape. Specifically, in one reported case from Oklahoma, an eighty-year-old woman, who had learned that Carpitcher was having sexual intercourse with her fourteen-year-old foster daughter, shot Carpitcher in the back. See Garrett v. State, 586 P.2d 754, 755 (Okla. Crim. App. 1987). Also, in February of 1982,

---

[3] On June 21, 2004, Carpitcher filed a petition for a writ of habeas corpus in federal district court. After the petition was filed, Virginia enacted the actual innocence statute, Code § 19.2-327.10 *et seq.* Thus, in January of 2005, the federal court dismissed the habeas petition, reasoning that Carpitcher's state remedies were not exhausted because Carpitcher had not yet petitioned for a writ of actual innocence.

[4] The actual innocence statute provides that the Commonwealth may "proffer [] any evidence pertaining to the guilt of the petitioner that is not included in the record of the case, including evidence that was suppressed at trial." Code § 19.2-327.11(C). And, in deciding whether to grant or deny the petition, this Court may consider, *inter alia*, "the response by the Commonwealth . . . ." Code § 19.2-327.13.

[5] Bryant lived in the house along with Carpitcher, H.L., and H.L.'s mother.

-4-

Carpitcher was charged with the rape of a seventeen-year-old woman in Oklahoma. According to the Commonwealth's proffer, the charge was subsequently dropped at the request of the victim.

After considering the Commonwealth's motion to dismiss, this Court ordered the circuit court to conduct an evidentiary hearing and to make findings of fact relating to the following two certified questions:

1. Whether the victim in this case has recanted the testimony she gave at the trial in any material way with regard to the culpability of the petitioner?

2. If such material recantation of her trial testimony has taken place, whether or not such recantation is the product of duress, undue influence or inappropriate pressure from others?

On June 27, 2005, the circuit court conducted an evidentiary hearing. During the hearing, H.L. testified that she had lied both during the criminal trial and during the state habeas proceeding, stating that Carpitcher had never committed any of the alleged crimes.

As to the findings of fact relating to the first certified question, the circuit court found that, "on all three occasions when the juvenile victim was required to testify, she was a person to whom an oath was lawfully administered, and that she did, willfully, on at least two of those occasions, swear falsely to material matters or things involving one or more of the elements of the felonies for which the defendant was charged." The court further stated that, "[h]aving testified differently about the same issues on three separate occasions, she is no longer credible." However, the trial court concluded that it "cannot determine which, if any, of the three versions of her testimony is truthful." In other words, the court found that, although H.L. had lied on two of the three occasions that she testified, the court could not identify which of those three occasions was the one during which she was telling the truth. Moreover, the court held that "nothing has been proven" in terms of whether the recantation was actually true and, thus, whether H.L. perjured herself during the jury trial.

As to the second certified question, the circuit court noted that, "[d]uring the past six years the juvenile victim has been questioned over and over again concerning the events surrounding the crimes

-5-

for which defendant stands convicted." The court further observed that, "[n]otwithstanding whatever inappropriate pressure those occurrences may have placed upon the child from the time she was 11 years old until now when she is 17 years old, her mother, who has never believed that her daughter was sexually abused, told her 'more times that [she] can remember,' that she was sick and tired of her daughter's lies and that if she didn't tell the truth about the defendant, she could pack her bags and go live with her father." Reasoning that "[t]he infant victim was and is fearful of leaving her mother and she does not want to live with her father," and also noting that H.L. "falsely denied that her mother made those threatening statements to her," the court found that

> The infant victim was threatened, intimidated and coerced to comply with the various subtle, and not so subtle, demands that she change her trial testimony. A summary of her latest sworn testimony is that she did not materially recant her trial testimony because of undue influence, duress or inappropriate pressure from others. Her veracity is questionable. The Court cannot determine, under any evidentiary standard, the truthfulness of her most recent testimony.

Following the issuance of the certified findings of fact, Carpitcher filed a "Brief Regarding Certified Findings of Fact" and an accompanying appendix, asserting that the trial court's findings of fact were erroneous and requesting oral argument before this Court. Three days later, Carpitcher filed a "Motion for Leave to File Brief Regarding Certified Findings of Fact," alleging that further briefing is warranted because the trial court, "in its consideration of the facts has implicitly imposed a higher burden of proof on Petitioner than is required by Virginia Code §§ 19.2-327.19 [sic] *et seq.*," further contending that the findings of fact "are clearly erroneous and are inaccurate in many critical respects that will effect [sic] and undermine this Court's consideration of the issues and resolution of this case." In response, the Commonwealth filed a motion to strike, requesting that this Court both deny the motion for leave to file a supplemental brief and strike Carpitcher's "Brief Regarding Certified Findings of Fact" for failure to comply with the applicable procedural rules.

For the reasons that follow, we grant the Commonwealth's motion to strike the supplemental briefing. And, because the record now before the Court provides an adequate basis upon which to

-6-

resolve the merits of this case, we deny Carpitcher's motion for leave to file additional briefing, deny his request for oral argument, and dismiss the petition for a writ of actual innocence.

## II.

The Court of Appeals has original jurisdiction over a petition for a writ of actual innocence. And, according to Rule 5A:5, "[a]ll proceedings before the Court of Appeals pursuant to its original jurisdiction shall be conducted in accordance with the procedure prescribed by Rule 5:7 of the Rules of the Supreme Court . . . ." Rule 5A:5.[6] Nothing in Rule 5:7, however, authorizes a party to file a supplemental briefing without first obtaining leave of court. Rather, Rule 5:7 expressly provides that, after a petition and a responsive pleading (if ordered) have been filed, "[f]urther proceedings shall be taken in accordance with the orders of this Court . . . ." Rule 5:7(e); see also Rule 5:7B(h).

Here, Carpitcher filed his supplemental brief before requesting leave to file additional briefing and, thus, without waiting for this Court to rule upon his motion. By filing a brief without first obtaining leave of court, Carpitcher violated Rule 5:7. Accordingly, we grant the Commonwealth's motion to strike Carpitcher's supplemental brief. See, e.g., Lenz v. Warden of the Sussex I State Prison, 267 Va. 318, 325 n.3, 593 S.E.2d 292, 296 n.3 (2004) (noting that a "supplemental brief" filed in a habeas proceeding "was rejected" by order of the court).

We must also decide, however, whether to grant Carpitcher's motion for leave to file supplemental briefing. Neither the provisions of the actual innocence statute nor the Rules of the Supreme Court of Virginia address the circumstances under which this Court should permit the parties to file additional briefing in a case within the original jurisdiction of this Court. The decision to grant or deny a motion for leave to file supplemental briefing, therefore, lies in the discretion of the Court.

---

[6] Rule 5:7 sets forth the procedure to be followed in cases where original jurisdiction lies in the Virginia Supreme Court, including petitions for a writ of habeas corpus, writ of mandamus, and writ of prohibition. See Rule 5:7(a).

Because the certified findings of fact issued by the trial court clearly resolve the merits of this petition, we conclude that neither additional briefing nor oral arguments would aid in the resolution of this case. Accordingly, we deny Carpitcher's motion for leave to file supplemental briefing, and we also deny his request for oral argument.

III.

Code § 19.2-327.10 provides that any individual who is "convicted of a felony upon a plea of not guilty" may file a petition for a writ of actual innocence in the Virginia Court of Appeals. The writ "shall lie to the court that entered the conviction," and "that court shall have the authority to conduct hearings . . . as directed by order from the Court of Appeals." Id.; see also Code § 19.2-327.12 (providing that the Court of Appeals may order the circuit court to "conduct a hearing" and to issue "certif[ied] findings of fact").

According to Code § 19.2-327.11, the petition for a writ of actual innocence must allege, *inter alia*, that the newly-discovered evidence:

(1) "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court," Code § 19.2-327.11(A)(iv),

(2) "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court," Code § 19.2-327.11(A)(vi),

(3) "is material and when considered with all of the other evidence in the current record will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt," Code § 19.2-327.11(A)(vii), and

(4) "is not merely cumulative, corroborative or collateral," Code § 19.2-327.11(A)(viii).

The petitioner must prove each of these four elements by clear and convincing evidence. See Code § 19.2-327.13. And, if the petitioner fails to carry his burden of proof, this Court "shall . . . dismiss the petition for failure to establish previously unknown or unavailable evidence sufficient to justify the

-8-

issuance of the writ." Id.; see also In re Bowling, 46 Va. App. 50, 55, 615 S.E.2d 489, 491 (2005); In re Dicks, 46 Va. App. 44, 47, 614 S.E.2d 677, 678 (2005); In re Barron, 44 Va. App. 536, 540, 605 S.E.2d 777, 779 (2004).

Of the four elements listed above, only the third is at issue in this case. Specifically, we must determine whether Carpitcher has carried his burden of proving, by clear and convincing evidence, that the victim's recantation of her testimony is "material" and, thus, renders the Commonwealth's case so tenuous that, had the recantation been produced at trial, "*no* rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii) (emphasis added).

This Court has never addressed whether a victim's recantation, standing alone, is sufficient to justify issuance of a writ of actual innocence. However, we begin our analysis with a well-settled legal principle: A verdict resulting from a trial, during which the evidence has been tested by the adversarial process, is presumed to be correct, and, thus, a heavy burden is placed upon those seeking to overturn it. Commonwealth v. Williams, 262 Va. 661, 669, 553 S.E.2d 760, 764 (2001) ("As we explained in Justis v. Young, 202 Va. 631, 632, 119 S.E.2d 255, 256-57 (1961), the circuit court's judgment is presumptively correct and the burden is on the appellant to present a sufficient record to permit a determination whether the circuit court committed an alleged error."); see also McDonald v. Nat'l Enters., Inc., 262 Va. 184, 195, 547 S.E.2d 204, 211 (2001); White v. Morano, 249 Va. 27, 30, 452 S.E.2d 856, 858 (1995); Oliver v. Commonwealth, 35 Va. App. 286, 296-97, 544 S.E.2d 870, 875-76 (2001). We further note that, in the context of other cases in which a petitioner has sought post-conviction relief based upon the recantation of a witness' testimony, the Virginia Supreme Court has observed that,

> "While discovery after trial, brought to the attention of the court in due
> time, that false testimony with respect to material facts has been given by
> a witness for the prosecution may constitute ground for a new trial,
> recantation by a State's witness does not necessarily entitle the accused to
> a new trial. The opportunity and temptation for fraud are so obvious that
> courts look with suspicion upon such an asserted repudiation of the

> testimony of a witness for the prosecution, and this is so even though the repudiation be sworn to."

Fout v. Commonwealth, 199 Va. 184, 192, 98 S.E.2d 817, 823 (1957) (quoting Lewis v. Commonwealth, 193 Va. 612, 625, 70 S.E.2d 293, 301 (1952)).  As one court has commented, "[t]here is no form of proof so unreliable as recanting testimony.  In the popular mind it is often regarded as of great importance[, but] [t]hose experienced in the administration of the criminal law know well its untrustworthy character."  People v. Shilitano, 112 N.E. 733, 736 (N.Y. 1916); see also Dobbert v. Wainright, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of application for stay of execution); Hysler v. Florida, 315 U.S. 411, 413 (1942).

Accordingly, where a witness' recantation is used to collaterally attack a conviction, "[t]here must be clear and convincing proof that the witness testified falsely at the trial, *and not merely proof that by reason of conflicting statements his testimony is unworthy of belief*."  Lewis, 193 Va. at 626, 70 S.E.2d at 302 (emphasis added).  The controlling inquiry, then, is not merely whether the recantation was true, but whether, considering the recantation in light of all the other evidence, the conviction was predicated upon perjured testimony.  See Ortega v. Duncan, 333 F.3d 102, 104, 107 (2d Cir. 2003).

To prove the materiality of the recantation, the petitioner must therefore establish either: (1) that the recantation is true, or (2) if the recantation is not true, that the witness' lack of credibility, when considered along with all the evidence in the case, establishes that the trial testimony was perjured.  See id.; see also Powell v. Commonwealth, 133 Va. 741, 756, 112 S.E.2d 657, 661 (1922) (holding that, where a witness recants her trial testimony, a new trial is warranted only if "the court has evidence before it which establishes the . . . perjury or mistake, in such a clear and convincing manner as to leave no room for doubt").  Where the evidence merely proves that the witness made conflicting statements and, therefore, "spoke falsely on one occasion," the recantation is insufficient to justify post-conviction relief because it does not, standing alone, "establish that his testimony at the trial was false and the

statements in the subsequent affidavit were true." Lewis, 193 Va. at 626, 70 S.E.2d at 302 (emphasis added).[7]

Thus, for H.L.'s recantation to be deemed "material," such that it "would" produce a different result in another trial, Carpitcher must prove, by clear and convincing evidence, that H.L. perjured herself at trial. See Lewis, 193 Va. at 626, 70 S.E.2d at 302 ("There must be clear and convincing proof that the witness testified falsely at the trial . . . ."). Carpitcher may carry his burden of proof either by establishing that the recantation is true, see, e.g., State v. Eder, 899 P.2d 810, 811 (Wash. Ct. App. 1995) ("We hold that recantation testimony, in the form of newly discovered evidence, warrants [post-conviction relief] only if it is material; [and] it is material only if it is true . . ."), or by establishing that H.L.'s lack of credibility, when considered along with all of the other evidence in the case, demonstrates that her trial testimony was perjured.

For the reasons that follow, we hold that Carpitcher has failed to carry his burden of proving, by clear and convincing evidence, that the recantation is material, such that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii). Accordingly, we dismiss his petition for a writ of actual innocence.

---

[7] Every other state court to have ruled upon a motion seeking post-conviction relief based upon a material witness' recantation has held that, before the conviction may be collaterally attacked, the reviewing court must be "satisfied that [the recantation] is true." Dobbert, 468 U.S. at 1234 (Brennan, J., dissenting); see, e.g., Borgess v. State, 455 So. 2d 488 (Fla. Ct. App. 1984); People v. Marquis, 176 N.E. 314, 315 (Ill. 1931); State v. Casale, 110 A.2d 588, 589 (Me. 1954); Madison v. State, 109 A.2d 96, 100 (Md. 1954); Commonwealth v. Robertson, 259 N.E.2d 553 (Mass. 1970); People v. Van Den Dreissche, 206 N.W. 339, 341 (Mich. 1925); State v. Caldwell, 322 N.W.2d 574, 585 n.7 (Minn. 1984); State v. Perry, 758 P.2d 268, 275 (Mont. 1988); State v. Puchalski, 211 A.2d 370, 376 (N.J. 1965); In re Young, 356 P.2d 766, 769 (Okla. Crim. App. 1960); Commonwealth v. McCloughan, 421 A.2d 361, 364 (Pa. Super. Ct. 1980); Brown v. State, 816 P.2d 818, 823 (Wyo. 1991). Although many jurisdictions seem to end the inquiry upon determining that the recantation is false, the more appropriate approach requires the appellate court to also consider whether the witness' lack of credibility (as established by the false recantation) tends to also establish that the witness perjured herself at trial. See, e.g., Lewis, 193 Va. at 626, 70 S.E.2d at 302; see also Ortega, 333 F.3d at 104-07; State v. Compiano, 154 N.W.2d 845, 849 (Iowa 1967) ("[I]f [the trial court] . . . is not reasonably well satisfied that the testimony given by the witness *on the trial* was false, it should deny the motion [for a new trial], and it is not at liberty to shift upon the shoulders of another jury the responsibility to seek out the truth of that matter." (emphasis added)).

A.    Whether the Recantation Is True

It is well settled that the truthfulness of a recantation is a question of fact to be resolved by the trial court.  See State v. Krum, 903 P.2d 595, 602 (Ariz. 1995) (*en banc*) ("Because of courts' historic suspicion of such evidence, the credibility of the recanted evidence is a controlling factor best determined by the trial judge." (internal quotations omitted)).  Thus, this Court should "give particular weight to the trial court's judgment in cases involving recanted testimony." Id. at 601.[8]  As noted by the Ohio Supreme Court,

> The trial judge is in a peculiarly advantageous position, under the prevailing circumstances, to pass upon the showing made for a new trial. He has the benefit of observing the witnesses at the time of the trial, is able to appraise the variable weight to be given to their subsequent affidavits, and can often discern and assay the incidents, the influences, and the motives that prompted the recantation.  He is, therefore, best qualified to determine what credence or consideration should be given to the retraction, and his opinion is accordingly entitled to great weight.  If the rule were otherwise, the right of new trial would depend on the vagaries and vacillations of witnesses rather than upon a soundly exercised discretion of the trial court.

Taylor v. Ross, 83 N.E.2d 222 (Ohio 1948) (internal quotations omitted); see also Yessen v. State, 126 N.E.2d 760, 762 (Ind. 1955); State v. Wynn, 34 P.2d 900, 901 (Wash. 1934).

Under the circumstances of this case, the circuit court, in its certified findings of fact, expressly found that, although H.L. "is no longer credible," Carpitcher did not prove "which, if any, of the three versions of her testimony is truthful."  Similarly, the circuit court held that it "cannot determine . . . the truthfulness of her most recent testimony," and that "nothing has been proven" in terms of whether the recantation was actually true.  This finding is supported by evidence in the record, specifically, the

---

[8] Cf. United States v. Johnson, 327 U.S. 106, 110-12 (1946) (where the district court denied a motion for new trial because the defendant failed to prove that the material witness had committed perjury, but the federal court of appeals held that "the trial judge's finding that [the witness] did not commit perjury was illogical and unreasonable," holding that the appellate court "should have decided that this does not present a reviewable issue of law and on its own motion have dismissed the appeal as frivolous," reasoning that "the district court's finding, that [the witness'] testimony was not shown to have been false, [was] not reviewable" and admonishing that appellate courts should "refrain from reviewing findings of fact which have evidence to support them").

-12-

inconsistencies in H.L.'s post-trial recantations as well as the evidence tending to establish that, at least briefly, H.L. recanted her recantation.[9]

Because this Court gives "great weight" to the circuit court's certified findings of fact, we hold that Carpitcher did not carry his burden of proving, by clear and convincing evidence, that the "statements in the subsequent affidavit were true." Lewis, 193 Va. at 626, 70 S.E.2d at 302. Accordingly, the recantation—standing alone—is insufficient to establish that H.L. committed perjury during the original criminal trial. Cf. Borgess, 455 So. 2d at 490 (holding that the trial court did not err in denying a motion for a new trial where a child victim of sexual abuse recanted her testimony but the trial court "was not satisfied that the recanting testimony was true," reasoning that "the trial judge was in the best position to evaluate the credibility of the child's conflicting stories" and that the trial court was not "required to find that the true version was the one told at the post trial hearing").

### B. Whether H.L. Committed Perjury

Although Carpitcher has not carried his burden of proving, by clear and convincing evidence, that H.L.'s recantation of her trial testimony is true, the circuit court also found that "[h]aving testified differently about the same issues on three separate occasions, [H.L.] is no longer credible." Thus, Carpitcher may carry his burden of proving the materiality of the recantation if he establishes that H.L.'s newly-discovered lack of credibility, when considered along with all of the other evidence in the case, demonstrates that her "testimony at the trial was false . . . ." Lewis, 193 Va. at 626, 70 S.E.2d at 302.

Here, other than the recantation, there is no additional evidence tending to establish that H.L. perjured herself during trial. Although H.L. had an alleged motive to commit perjury (specifically, to end the relationship between Carpitcher and her mother), the existence of a motive to lie does not establish, by clear and convincing evidence, that the witness did, in fact, perjure herself during the

_____

[9] As noted by the Commonwealth, the results of a polygraph examination are not "evidence" in Virginia and, as such, cannot be considered as contributing to the veracity of the recantation. See, e.g., Robinson v. Commonwealth, 231 Va. 142, 156, 341 S.E.2d 159, 167 (1986) ("[P]olygraph examinations are so thoroughly unreliable as to be of no proper evidentiary use . . . .").

criminal trial. Indeed, evidence of H.L.'s "motive" to lie was introduced during H.L.'s cross-examination during the original criminal trial and was, therefore, implicitly rejected by the jury. Also, as noted by the Commonwealth, there is additional evidence, discovered post-trial, that tends to corroborate H.L.'s trial testimony.[10]

Considering, as the trial court found in its certified findings of fact, that the victim was "threatened, intimidated and coerced to comply with the various subtle, and not so subtle, demands that she change her trial testimony," a reasonable fact finder could disregard the recantation and conclude that the victim, during her initial trial testimony, was telling the truth. Accordingly, the recantation, standing alone, is insufficient to prove that H.L.'s trial testimony was perjured. See United States v. Rouse, 410 F.3d 1005, 1009 (8th Cir. 2005) (affirming denial of motion for a new trial where the child victims, who recanted their trial testimony, "had been living with their mothers for at least two years," and "[t]hese women never believed the children's accusations, and testified on the defendants' behalf at trial"); Provost, 969 F.2d at 621 (affirming denial of a new trial where "the district court found that [the child victim's] recantation was influence by family pressures" and that "her recantation was not credible"); cf. State v. Nicholson, 296 S.E.2d 342, 345 (W. Va. 1982) (*per curiam*) (affirming denial of a motion for a new trial where the court "d[id] not believe that there is even a remote possibility that the jury would find the recanting affidavits and subsequent testimony any more believable than the original trial testimony").

IV.

For these reasons, we hold that Carpitcher has failed to carry his burden of proving, by clear and convincing evidence, that the recantation is truthful, and that, had the inconsistent statement been

---

[10] Specifically: (1) the medical examination, which revealed physical evidence consistent with penetration of H.L.'s vagina by a finger, see note 1, supra, (2) Carpitcher's record of committing prior, similar crimes, (3) Carpitcher's statement that, if H.L. lived on a reservation, she would have already been "broke in," and (4) Henry Bryant's statement that Carpitcher and H.L. had, in fact, been left alone together on multiple occasions.

produced during trial, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii). Accordingly, we dismiss his petition for a writ of actual innocence. See Code § 19.2-327.13.

Because the issues addressed herein are of first impression and potential litigants and members of the bar may benefit from the directives herein, we direct the Clerk to publish this order.

The Attorney General shall recover of the petitioner his costs expended herein.

Attorney General's costs:

Attorney's fee     $50.00


A Copy,

Teste:

Clerk