COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judge McClanahan and Senior Judge Fitzpatrick
Argued at Richmond, Virginia


KEVIN LAMONT TUCKER

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1672-05-2          JUDGE JOHANNA L. FITZPATRICK
                                                    NOVEMBER 21, 2006
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Gary A. Hicks, Judge

Michael E. Hollomon for appellant.

Karri B. Atwood, Assistant Attorney General (Robert F. McDonnell,
Attorney General, on brief), for appellee.


Appellant was convicted in a bench trial of statutory burglary, use of a firearm during the

commission of a felony, two counts of attempted malicious wounding, and shooting into an

occupied dwelling.[1]  On appeal, he maintains the evidence was insufficient to support his

convictions.  We affirm the trial court.

BACKGROUND

Under familiar principles of appellate review, we examine the evidence in the light most

favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible

therefrom.  See Juares v. Commonwealth, 26 Va. App. 154, 156, 493 S.E.2d 677, 678 (1997).

On September 24, 2004, Melissa Johnson awoke at approximately 4:00 a.m. to the sound of loud

thuds against her locked front door, and told her husband, Larry, that she thought someone was

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant's conviction of shooting into an occupied dwelling is not before us.

trying to break into their house. As the Johnsons looked for a telephone to call "911," they heard their front door being kicked in and their internal alarm system activate. Melissa heard the voices of two young males in the house yell, "ATF, ATF, put your hands up," followed by, "Oh, shit."

Melissa testified, "[I]t seemed like they were coming towards us, as if the focus was on our bedroom." Larry responded by moving towards their bedroom door, but retreated at the sound of gunfire. As the Johnsons remained in their bedroom, they heard three to five gunshots fired. Two shots penetrated the bedroom wall, one of which grazed Melissa's thigh as she lay in her bed, and the other entered her pillow. After hearing the intruders run down their front porch steps, Larry left the bedroom and went to the front door, where he met a police officer who had responded to their alarm.

The Johnsons' neighbor, Linda Crisswell, testified that she heard three shots, a pause, then additional shots. During the break in the gunfire, she looked through her screen door. As she heard the second round of gunshots, Crisswell saw a tall individual run in a diagonal direction toward the house across the street. Within seconds, she saw a second, shorter man follow the first man's path and run diagonally across the street behind a garage.

When the police arrived, Crisswell told them about the two fleeing men. Officer James Turner and his tracking dog, "Kitt," later came to the area. After being informed that the suspects "had run across the street and gone between two houses," Turner took Kitt to that spot to begin the tracking. Turner stated that he did not try to have the dog pick up a scent at the Johnsons' front door because "heavy foot traffic" had contaminated the area.

Kitt alerted on a scent between the two houses and followed it through a garage area. The dog briefly lost the track, but picked it up again, and shortly after entering the woods, Kitt

signaled Turner that a human being was close by. Turner did not see appellant, who was in a dark, weeded area, until Kitt bit and detained him. Turner then placed appellant in handcuffs.

The police found a car stuck in a ditch near where appellant was detained. The car contained a jacket with oriental symbols that matched symbols on appellant's pants, as well as his DNA and fingerprints.

Appellant made several conflicting statements. Initially, he claimed he had walked from his girlfriend's home and lay down in the bushes because he was tired. Appellant also said that a friend had dropped him off at his girlfriend's house, but he was unsure about the friend's name or phone number.

He also claimed he had not fired a gun, and held up his hands and said, "Go ahead and test me for gunpowder . . . ." Analysis of samples taken from appellant's hands revealed a particle of primer residue on his right hand. Douglas Degaetano of the Division of Forensic Science testified that primer residue could be deposited on a person's hands from firing a weapon,[2] handling a dirty weapon, touching an object with primer residue on it, or being in close proximity to the discharge of a weapon. He also noted that primer residue could be wiped off, or washed away as the result of rainy conditions or perspiration.

Additionally, appellant identified himself falsely to Officer Wes Partin as Jermaine Fleming.[3] He stated he "was just sleeping in the woods when the dog came up and bit him." Although appellant told Partin he had come to the area to see a girlfriend who lived on

---

[2] Forensic test results offered into evidence by the Commonwealth established that the bullets and cartridges recovered at the Johnson home were fired from two different weapons. The report stated that, "[b]ecause of differences in class characteristics, the item 7 and 9 cartridge cases could not have been fired in the same firearm that fired the item 1 through 5 cartridge cases."

[3] Appellant continued to maintain that his name was Jermaine Fleming after his arrest, and signed his fingerprint card with the false name.

Darbytown Road, he pointed in the direction opposite to Darbytown Road. Appellant told Partin he had been in the woods "for a long time," but Partin noted that appellant's shirt was dry despite the ground being saturated with dew. Partin testified he became wet from the dew after being in the woods a very brief time.

ANALYSIS

I.

Appellant first contends that the evidence is insufficient to support his burglary conviction because the Commonwealth failed to prove he or his accomplice entered the Johnsons' home. He also asserts that the Commonwealth failed to prove his involvement in the burglary, even as a principal in the second degree. We disagree.

"When the sufficiency of the evidence is challenged on appeal, we determine whether the evidence, viewed in the light most favorable to the prevailing party, the Commonwealth, and the reasonable inferences fairly deducible from that evidence support each and every element of the charged offense." Slade v. Commonwealth, 43 Va. App. 61, 69, 596 S.E.2d 90, 94 (2004) (citing Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999)). In so doing, we must "'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" Stevens v. Commonwealth, 44 Va. App. 122, 127-28, 603 S.E.2d 642, 645 (2004) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 254, 584 S.E.2d 444, 446 (2003) (en banc)).

> In considering an appellant's alternate hypothesis of innocence in a circumstantial evidence case, we must determine "not whether there is some evidence to support" the appellant's hypothesis of innocence, but, rather, "whether a reasonable [fact finder], upon consideration of all the evidence, could have rejected [the appellant's] theories in his defense and found him guilty of [the charged crime] beyond a reasonable doubt."

- 4 -

Emerson v. Commonwealth, 43 Va. App. 263, 277-78, 597 S.E.2d 242, 249 (2004) (quoting

Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003)). "The statement that

circumstantial evidence must exclude every reasonable theory of innocence is simply another

way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt."

Hudson, 265 Va. at 513, 578 S.E.2d at 785 (citation omitted).

"While no single piece of evidence may be sufficient, the 'combined force of many

concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind

irresistibly to a conclusion.'" Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808,

818 (1979) (quoting Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 526, 564 (1919)).

"'Guilt of breaking and entering a building may be established by circumstantial evidence;

eyewitnesses are not required.'" Hope v. Commonwealth, 10 Va. App. 381, 385, 392 S.E.2d

830, 833 (1990) (*en banc*) (quoting Fout v. Commonwealth, 199 Va. 184, 189, 98 S.E.2d 817,

821 (1957)).

The evidence established that the Johnsons awoke to the sound of their dead-bolted front

door being kicked in, followed by the voices of two young males in the house shouting, "ATF,

ATF, put your hands up!" While the Johnsons were unable to see the exact location of the

intruders, Melissa testified, "[I]t seemed like they were coming towards us, as if the focus was on

our bedroom." Photographs of the front door clearly showed the imprint of a foot, as well as

damage to the doorframe when the dead-bolted door was forced open. Their internal home alarm

system was activated by the presence of the burglars. Clearly the door was breached. Because

the evidence established an "entry," the evidence was sufficient to prove the requisite entry into

the home. See Franklin v. Commonwealth, 28 Va. App. 719, 722, 508 S.E.2d 362, 364 (1998)

(For purposes of statutory and common law burglary, "an entry occurs when any part of the body

enters a dwelling.").

The Commonwealth was not required to prove that appellant kicked in the door.

> "A principal in the second [] degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." Brown v. Commonwealth, 130 Va. 733, 736, 107 S.E. 809, 810 (1921). As for what constitutes "aiding and abetting," it is clear that mere presence and consent will not suffice. The defendant's conduct must consist of "inciting, encouraging, advising or assisting in the murder." Frye v. Commonwealth, 231 Va. 370, 389, 345 S.E.2d 267, 280 (1986). It must be shown that the defendant procured, encouraged, countenanced, or approved commission of the crime. "To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal." Triplett v. Commonwealth, 141 Va. 577, 586, 127 S.E. 486, 489 (1925).

Rollston v. Commonwealth, 11 Va. App. 535, 539, 399 S.E.2d 823, 825 (1991) (some citations omitted). See also Code § 18.2-18 (in felony cases, except most capital murders, principal in second degree may be indicted, tried, convicted, and punished in all respects as if principal in first degree).

There were two males involved in kicking in the front door of the house, and Crisswell saw two males running from the scene. The tracker dog picked up appellant's scent across the street in the same area where the two fleeing men had been seen running, and followed it directly to appellant, who was lying in an overgrown area a short distance away. Appellant gave conflicting stories about why he was hiding in the woods at 4:30 in the morning, and he was connected to a car parked close by, containing clothes with his DNA on them and his fingerprints on the door.

Lastly, although the ground was heavy with dew at the time appellant was apprehended, appellant's clothes were dry, evidence which further discredited his statement that he had been in the woods "for a long time." He provided a false name to police when he was apprehended, and persisted in the use of that name even through his fingerprinting process. See Rollston, 11 Va. App. at 548, 399 S.E.2d at 831 (Defendant's inconsistent stories to police are "probative to

show he is trying to conceal his guilt, and thus [are] evidence of his guilt."). See also Pease v. Commonwealth, 39 Va. App. 342, 357, 573 S.E.2d 272, 279 (2002) (jury could evaluate the reasonableness of the defendant's story, and upon rejecting it, was entitled to infer he was lying to conceal his guilt).

Thus, viewing the evidence as a whole, it proved beyond a reasonable doubt that appellant was present and assisted in a burglary at the Johnsons' home.

## II.

Appellant also argues that the evidence was insufficient to support his conviction for the use of a firearm in a burglary. Again, we disagree.

Appellant was convicted under Code § 18.2-53.1, which states that

> it shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearms or display such weapons in a threatening manner while committing or attempting to commit burglary . . . .

Appellant argues that a firearm was not used in the commission of a burglary because no weapon was fired until after he and his accomplices had gained entry into the Johnsons' house. In Creasy v. Commonwealth, 9 Va. App. 470, 389 S.E.2d 316 (1990), we rejected this argument, stating

> Code § 18.2-53.1 is not limited in application to the period of time from the commencement of the underlying crime until the point in time when the acts of the defendant make successful prosecution possible. We hold that the statute applies to the conduct of the accused until the underlying crime is completed in fact.
>
> The purpose of Code § 18.2-53.1 is to deter violent criminal conduct. Violent criminal conduct may occur at any time between the commencement of certain crimes and the perpetrator's safe retreat. Even though certain crimes may be established by proof of acts accomplished at the outset of a criminal venture, the danger and risk of violent criminal conduct persists until the crime is completed in fact. We hold that the General Assembly, in

> adopting this provision, intended to discourage the use of a firearm at any time during the course of the specified criminal endeavors.

Id. at 473, 389 S.E.2d at 318 (citations omitted).

Thus, the evidence was sufficient to support the conviction for use of a firearm in the commission of a burglary.

### III.

Lastly, appellant contends the evidence was insufficient to support his conviction for attempted malicious wounding. He argues the evidence did not prove that "the perpetrators, arguably Mr. Tucker, intended to maliciously wound any person in the house" because there was "no evidence presented that the perpetrators knew that anyone was in the house at the time of the shooting."

"Malicious . . . wounding requires that the accused has the specific intent to 'maim, disfigure, disable or kill' the victim of the attack." Commonwealth v. Vaughn, 263 Va. 31, 35, 557 S.E.2d 220, 226 (2002) (quoting Code § 18.2-51). Here, the perpetrators broke into a home in the middle of the night when occupants were likely to be home sleeping, and yelled the warning to them of "ATF, ATF, put your hands up!" Melissa testified the intruders seemed to be moving toward their bedroom, prompting her husband to move toward their bedroom door.

From this evidence, the fact finder could reasonably infer that the intruders believed the home was occupied and wanted to prevent the occupants from arming themselves. Furthermore, multiple shots were fired into the walls and ceiling, one of which ultimately wounded Mrs. Johnson. A permissible inference from the direction of the gunfire was that the shooters intended to strike and disable potential adversaries. Accordingly, the evidence was sufficient to prove the offense of attempted malicious wounding. Thus, we affirm the trial court.

Affirmed.