PEOPLE *v.* VAN DEN DREISSCHE.

CRIMINAL LAW—NEW TRIAL PROPERLY DENIED WHERE BASED UPON IMPROBABLE AFFIDAVIT.

> In a prosecution for statutory rape committed upon defendant's own 13-year old daughter, the motion for a new trial, based upon the affidavit of the daughter, in which she denied the truth of the testimony given by her upon the trial, was properly denied where the statements in the affidavit lack corroboration, many of them are denied by counter-affidavits, she contradicted herself on many vital points on the hearing on said motion, and the improbability of the truth of the affidavit is quite apparent.[1] BIRD and WIEST, JJ., dissenting.

Error to Eaton; McPeek (Russell R.), J. Submitted October 15, 1925. (Docket No. 123.) Decided December 22, 1925.

Desire Van Den Dreissche was convicted of statutory rape, and sentenced to imprisonment for life in the State prison at Jackson. Affirmed.

*Joseph L. Hooper* (*W. J. Barnard,* of counsel), for appellant.

*Andrew B. Dougherty,* Attorney General, *Fisk Bangs,* Prosecuting Attorney, and *C. J. Marshall,* Assistant Prosecuting Attorney, for the people.

SHARPE, J. The defendant was convicted of having committed rape upon his daughter Mary, aged 13 years, and sentenced to imprisonment for life. A motion for a new trial was made, and denied. The only assignment of error is predicated upon the denial of this motion. It was based upon an affidavit of the

---

[1]Criminal Law, 16 C. J. § 2715.

little girl, in which she stated that her testimony as a witness on the trial was false; that her father had never had sexual intercourse with her.     A somewhat extended reference to the proof submitted on the trial and the events following the conviction seems necessary.

The little girl testified on the trial that on the afternoon of Sunday, November 11, 1923, her father, who was alone in his farmhouse with her, came upstairs where she was, and had intercourse with her on a bed in one of the rooms; that similar acts had been committed by him many times during the preceding year; that she first told about it on Monday, November 19th, to two girls, Ethel Loomis and Mildred Peck, while in the toilet room at the schoolhouse; that at the noon hour that day she went with Ethel Loomis to her home and there told Mrs. Loomis, and said to her that she was going to tell her older sister, Vera, who was living at the home of Charles Coopman, some miles distant; that Mrs. Loomis advised her to do so, and that on that evening she and Ethel went to the Coopman home, and she there told her sister Vera what her father had done to her.     On November 22d, defendant was arrested and brought from his farmhouse to Charlotte, the county seat, and lodged in jail.     After his arrest, and until the trial, Mary stayed with Hattie Merritt, the matron of the Eaton county detention home at Charlotte.     Mary testified that a few days after her father's incarceration she saw him alone in the jail; that he then urged her "to lay it onto a man of Lansing, a boy, and he said that I told, I was mad, you know, because I could not have any powder, nor have a new dress," and that she told him she "would not tell any lie."

After the defendant's conviction, Mary was sent to the State school at Coldwater.     About three months later, her elder brother, Caesar, 18 years old, went to

see her at the school, and a few days later he again saw her there.    He was then accompanied by Mildred Peck.    Both he and Mildred had been witnesses for the defendant on the trial.

On June 14, 1924, Mary made the affidavit on which the motion was founded, in which she stated—

"that the evidence which she gave upon said trial as to such charge was wholly false, that her father, the said Desire Van Den Dreissche, never at any time or under any circumstances committed any such offense against her nor did he ever attempt to do so.    She states further that she gave such testimony upon the trial at Charlotte under fear of threats made by an elder sister of deponent now living near Eaton Rapids, Michigan, who has had trouble with the father of deponent some time previous to the trial of said cause and who told this deponent that unless she testified as she did upon the trial of said cause that she, this deponent, would be sent to Adrian or some other institution."

The interview of defendant's then attorney, Mr. Hooper, which resulted in the making of this affidavit, was had in the presence of Dr. Ives, the superintendent of the school.    It appears that no person was present at her first interview with her brother Caesar, or any other person than Mildred Peck at the subsequent interview.    Mary's affidavit was supported by that of Dr. Ives and Attorney Champion of Coldwater, both of whom stated that she voluntarily made the statements contained in it.

After the motion was filed, the prosecuting attorney went to Coldwater, and had an interview with Mary in the presence of Dr. Ives, in which she insisted that the facts stated in the affidavit were true.    At the hearing on the motion, Mary was brought into court and examined at length as to the facts stated in her affidavit.    She still insisted that her father had never had intercourse with her, and that her testimony given on the trial was untrue.    She then stated, as she had

in the interview with the prosecutor, that on November 10th a Belgian, whose name she did not know, but whose given name was Henry, had come to her home when she was alone and had forced her to submit to an act of intercourse, and that he had returned the next day and again committed the offense, and that these were the only occasions in which she had ever had intercourse with any one.    She again stated that she had testified as she did because her sister Vera wanted her to tell it and had said "if I didn't I would go to Adrian or some place, and she would go to some other place."    She also stated that a neighbor, named Louis Slembrauck, was at her home on the Sunday in question, and that the man named "Henry" had stayed at Slembrauck's house on the night of the 10th.

There is nothing in the record which in any way tends to support the truthfulness of her story as then told.    Let us examine the facts disclosed by the affidavits and on the trial which tend to show its improbability.    A few days after the defendant's arrest, Mary was examined by Dr. Huber, a physician of long experience.    He testified at the trial, and perhaps more clearly stated in his affidavit, that the condition of her genital organs was such as would be found in a female who had had sexual intercourse many times over a period of time, and could not have been caused by two such acts.    Dr. Sassaman examined Mary in February, 1924, and in an affidavit expressed the like opinion.

We quote from her testimony taken on the motion:

"Q. When was it that your sister told you to state this about your father, can you tell us?

"A. Some time on the road, some time we were at our house, and sometimes down to her house.

"Q. Did she say it to you more than once, then?

"A. No, she just said it once over to Merritt's, but she had a chance to see me nearly every day.    I was at Mrs. Merritt's house when she told me about my going to Adrian if I didn't make this statement."

The court here interrupted with the remark that Mary was not at Mrs. Merritt's until after the arrest of the defendant, and himself asked her:

"When was it that your sister, you say, told you to tell this, when you were at Mrs. Merritt's?"

and she answered:

"No, my sister told me to tell that about my father at Coopman's."

After stating the facts as testified to on the trial about her telling the girls at school, and that she and Ethel Loomis went to Coopman's, she testified:

"*Q.* How did you go down to Coopman's?
"*A.* We took the horse and buggy.    Ethel drove. I saw Vera, my sister.    She was at the barn doing chores.
"*Q.* What did you tell Vera?
(No answer.)
"*Q.* What did you tell Vera?
"*The Court:* Just leave the question stand.
"*Q.* Just tell the stenographer what you told Vera.
"*A.* I told Vera that my father had had intercourse with me.
"*Q.* You told Vera that your father had had intercourse with you?
"*A.* Yes, sir.    We did not go in the Coopman house. We were on the back porch.    I saw Mrs. Coopman and heard Vera tell Mrs. Coopman what we had told her.
"*Q.* That was that your father had had intercourse with you?
"*A.* Yes, sir.
"*The Court:* Well, let me ask, when had you seen Vera before this?
"*A.* Why, I seen her to her house.    I seen her sometimes on the road; when she went by she would stop.
"*The Court:* Was this the first time you had seen her since these acts of intercourse took place?
"*A.* I had seen her before.
"*The Court:* Well, I say, since the acts of inter-

course took place.     Was this the first you had talked
with her about that?

"*A.* After it happened?

"*The Court:* Yes.

"*A.* That was the first time.

"*The Court:* And you went over with the little
Loomis girl to tell Vera about it?     Is that true?

"*A.* Yes, sir."

Later she testified:

"My sister told me I would go to Adrian and I
didn't want to go.     She told me I would go to Adrian
or a bad place.     My sister told me every time she was
down to see me.     That is all she was talking about,
was Adrian or a place like that.     She always told
me that if I didn't say about my father I would go
to a bad place.     She didn't say Adrian, she said a
bad place or prison, that is all she said.     If I didn't
tell that about my father.

"*Q.* Do you mean to tell the judge here that your
sister came down there and told you that if you didn't
tell that about your father that you would go to
Adrian?

"*A.* Yes, sir.

"*Q.* When did she tell you that?

"*A.* She told me that every time she came down.
She told me this down at Mrs. Merritt's.

"*Q.* That is the first time she ever told you this,
was it?

"*A.* Yes, sir.

"*Q.* Then the first time she ever told you that if
you didn't tell it was your father you would go to
Adrian, was while you was down to Mrs. Merritt's.

"*A.* She told me at our home that I would go.     She
wanted to get my father in prison ever since my
mother died.     Mr. Dilley came down many times too.
She told me at our house to lay it on my father.

"*Q.* That was the time that Ethel Loomis was there?

"*A.* Yes, sir.     She told me then to lay it on my
father.     *     *     *

"*The Court:* Well, you had these acts of intercourse
you say on the 10th or 11th?

"*A.* Yes, sir.

"*The Court:* Now, you had—who did you first tell
about these acts of intercourse?

"*A.* I told my sister and after that I told Ethel Loomis.

"*The Court:* When did you tell your sister?

"*A.* I told her some one had intercourse with me just before I told Ethel Loomis and Mildred. I saw her on the road. * * * I told her the night she took me over in the car and stopped at Peter Simons'. Mr. and Mrs. Coopman and the boy were in the car with us. I told her the night after these people came up, on that Saturday night. It was not down to Mrs. Merritt's. I have just been telling you that it was down to Eaton Rapids. It was the 10th of November when I told her.

"*Q.* You told your sister it was on the 8th of November?

"*A.* Yes, sir.

"*Q.* And it was the very day that this man had had intercourse with you?

"*A.* Yes, sir. I did not tell her who it was. I just said some one had intercourse with me, and she told me to lay it on my father. She didn't ask who it was. She didn't stop to ask me who it was. She just told me to lay it on my father. I rode down the road in this car with Mr. Coopman, Mrs. Coopman, my sister and Marshall Coopman."

She testified that Vera had said at the Coopman home that the reason she had left her father's house was because he was insisting on her submitting to his desires in the same respect.

Affidavits of Vera and of Mr. and Mrs. Coopman and their son Marcel were filed, in which they all deny in positive terms that Mary rode with them in the Coopman car at any time in the month of November, 1923. An affidavit made by Louis Slembrauck was filed, in which he stated that he was living in the city of Lansing on November 10th and 11th, and that Mary's statement that he was at her home on November 11th was not true.

There was nothing in the disclosures at the trial to indicate that Mary had any motive in charging her father with the commission of the crime. What oc-

curred on November 11th was not new to her.   She was in no way shocked by it.   She first spoke of it to the two school girls without any apparent appreciation of the enormity of what her father had done.   It was not by way of complaint against her father.   To Ethel Loomis it appeared shocking, and she took her home with her, where the charge was repeated to Ethel's mother, as above stated.

It seems clearly established that she had not at this time seen her sister since the crime was committed. She admitted that the prosecutor, when he first interviewed her, urged her strongly to tell the truth.   She had a private interview with her father when he was in the jail, and insisted that she told him she would not lie about it.   Mrs. Merritt in an affidavit states that she several times talked with her at the deten- tion home before the trial, urging her to be truthful in the testimony she should give.   Had the superin- tendent been present at her first, or even subsequent, interview with her brother, and heard her state that the testimony she gave on the trial was untrue, the story she now tells would be entitled to more credence.

The trial court was duly impressed with the duty he was called upon to perform.   In a carefully pre- pared opinion, the length of which alone causes us to refrain from publishing it, he reviews the matter sub- mitted to him.   He said:

"As I see the matter, outside of the bare denial that her father had intercourse with her, there is hardly an item in the present story of Mary Van Den Dreissche that entitles it to credit.   She contradicts herself in so many instances, and is contradicted by others so vitally that I do not feel justified in taking action that, in its effect, would be, as I view the case, a virtual exercise of executive power."

His final conclusion was thus stated:

"As already suggested, I am not unmindful of the considerations that should weigh in this matter, but in view of the entire record, I am forced to the conclusion

that the present story of Mary Van Den Dreissche is so improbable, and is so completely discredited by its own contradictions, and the other facts and circumstances in the case, that to grant this motion would be a violation of the rules of sound judgment.    In my opinion, the granting of this motion, upon this record, would be lending approval to what might become a dangerous practice."

The last sentence is very suggestive.    In this class of cases, it would be rare, indeed, for the prosecution to be able to produce an eyewitness to the commission of the crime, and if a change in the testimony given by the little girl months after the trial, when the improbability of its truth is so apparent as is disclosed by this record, should be sufficient on which to base an order for a new trial, many men rightfully convicted of such offenses would be set at liberty.

In 16 C. J. p. 1189 it is said:

"Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true."

In *People* v. *Shilitano*, 218 N. Y. 161 (112 N. E. 733, L. R. A. 1916F, 1044), the court said that—

"recantation in and of itself does not necessarily require the court to order a new trial,"—

and thereafter added:

"There is no form of proof so unreliable as recanting testimony.    In the popular mind it is often regarded as of great importance.    Those experienced in the administration of the criminal law know well its untrustworthy character."

After a very careful consideration of the entire record, we find that there was no abuse of discretion in the denial of a new trial.

The judgment is affirmed.

McDONALD, C. J., and CLARK, MOORE, STEERE, and FELLOWS, JJ., concurred with SHARPE, J.

BIRD, J. (*dissenting*).    I cannot understand why so much credence should be given to the girl's veracity *on the trial* and so little *afterward.*    She has shown herself unworthy of belief.    If she had testified on the trial both ways the jury would have been entitled to say which story was true.    Why should they not now determine whether her testimony or affidavit was true?    In the interest of justice the father should be given another trial before he is sent to prison for committing such an unnatural offense on such unreliable and uncorroborated testimony.

The judgment of conviction should be reversed and a new trial granted.

WIEST, J., concurred with BIRD, J.