*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 14, 2022

Plaintiff-Appellee,

v

No. 351195
Berrien Circuit Court
LC No. 2009-015174-FC

JONATHAN CASTILLO,

Defendant-Appellant.

Before: SAWYER, P.J., and LETICA and PATEL, JJ.

PER CURIAM.

A jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a), and he was sentenced to a mandatory term of life imprisonment without parole. Defendant's conviction was affirmed on appeal.[1] Defendant's federal habeas petition was denied[2] and his initial motion for relief from judgment was denied.[3] Eight years after his conviction, defendant filed his second motion for relief from judgment and sought a new trial based on allegedly exculpatory testimony from a newly discovered witness – his brother-in-law. The trial court denied the motion. Defendant

---

[1] *People v Castillo*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2011 (Docket No. 294354). Our Supreme Court denied defendant's application for leave to appeal. *People v Castillo,* 490 Mich 892; 804 NW2d 329 (2011).

[2] *Castillo v Smith*, unpublished order of the United States District Court for the Eastern District of Michigan, issued April 24, 2013 (Case No. 13-CV-59).

[3] Defendant's first motion for relief from judgment included a 2009 affidavit prepared by Danielle Watson that included several statements that were inconsistent with her trial testimony. In addition to credibility issues, the trial court concluded that most of the claims in the affidavit were not new or were cumulative of evidence that was presented at trial. The trial court concluded that there was substantial evidence presented at trial to support the verdict and denied the motion. This Court denied defendant's delayed application for leave to appeal. *People v Castillo*, unpublished order of the Court of Appeals, entered May 9, 2014 (Docket No. 321022).

now appeals as if on leave granted.[4] We conclude that the trial court did not err in its assessment that the witness was not credible and that his testimony would not make a different result probable on retrial. We also find that any alleged translation errors did not affect the trial court's determination that the witness's testimony was not credible. Accordingly, we affirm.

## I. FACTUAL BACKGROUND

Defendant's conviction stems from the February 2009 fatal stabbing of Michael Evans in the driveway of the home of defendant's sister, Brenda Macedo. The victim and defendant got into a physical altercation when the victim accompanied Danielle Watson to retrieve two of her children from a visit with defendant. Watson was the victim's girlfriend. But Watson and defendant were previously in a long-term relationship and had three children together.[5] Watson testified that defendant disapproved of her relationship with the victim, made racially disparaging remarks about the victim, and threatened to harm both the victim and Watson.[6] Because of the threats, the victim and his cousin, Dekoven Evans, accompanied Watson to pick up her children from defendant. Defendant and the victim engaged in a fistfight, which ended when defendant fatally stabbed the victim. Seconds after the stabbing, defendant, Brenda, and Brenda's fifteen-year-old son fled the scene in a vehicle, nearly running over the victim's prone body in the driveway. Defendant fled from Michigan and was arrested in Indiana early the following morning.

Defendant admitted at trial that he inflicted the victim's fatal knife wound, but he claimed that it was an accident.[7] He testified that he and the victim were slipping and falling down on the icy driveway as they fought. They fought down the driveway and fell into the road. The first time that defendant saw the knife was when he and the victim were at the end of the driveway. The victim had the knife in his hand as he was getting up and he dropped it. Defendant grabbed the

---

[4] This Court initially denied defendant's application for leave to appeal on March 10, 2020. *People v Castillo*, unpublished order of the Court of Appeals, entered March 10, 2020 (Docket No. 351195). On June 23, 2021, in lieu of granting leave, our Supreme Court remanded the case to this Court to consider as on leave granted. *People v Castillo*, 507 Mich 992 (2021).

[5] The status of the relationship between Watson and defendant was disputed at trial. Watson testified that she parted ways with defendant due to his "abusiveness" and drug use. She maintained the that relationship was over. However, defendant and others maintained that the couple was in the process of rekindling their relationship at the time murder.

[6] Defendant left obscenity-laced threats on Watson's answering machine. These voicemails were played at trial.

[7] Defendant told several versions of events during his initial interrogation. First, he denied stabbing the victim and claimed that the victim either stabbed himself or Brenda stabbed the victim. Then he admitted that he stabbed the victim, but claimed that it was an accident. At trial, he admitted that he had lied to the officers several times during his interrogation.

knife off of the ground and they continued to fight. Defendant claimed that he accidentally stabbed the victim as they fell to the driveway. But defendant also asserted that he acted in self-defense.[8]

A forensic examiner testified that the fatal stab wound had penetrated the victim's abdomen at a depth of "seven or eight inches," reached the "front of the spinal cord where the aorta is," and ruptured the aorta. A second stab wound appeared in the victim's back near a shoulder.[9] While defendant contended that the victim is the one that pulled the knife during the fight, forensic evidence confirmed that defendant's deoxyribonucleic acid (DNA) profile matched the major DNA profile on the knife handle, while the victim's DNA profile appeared only on the knife blade. Moreover, defendant did not have any injuries.

Watson, Evans, and defendant's nephew all testified that defendant and the victim were fighting in the street behind Watson's car immediately before the stabbing occurred.[10] Neither Watson nor defendant's nephew ever saw a knife. Evans testified that defendant and the victim were "swinging wildly" at each other and then they both fell to the ground. While they were on the ground, Evans saw defendant "making a stabbing motion." And as defendant got up and walked away, Evans saw the knife fall from defendant's sleeve. Brenda picked the knife up and tossed it into the snow. Evans denied that the victim had possessed a weapon on the morning of the murder. Watson did not believe that the victim had any weapons in his possession on the morning of the murder.

The jury found defendant guilty of premeditated murder and he was sentenced to mandatory life in prison. He was unsuccessful with his direct appeal, his federal habeas petition, and his initial motion for relief from judgment.

## II. SECOND MOTION FOR RELIEF FROM JUDGMENT

In March 2017, defendant filed a second motion for relief from judgment on the basis of a May 2016 affidavit from his brother-in-law, Osvaldo Villafuerte. Villafuerte stated that he witnessed the February 2009 altercation between defendant and the victim. He maintained that he did not come forward sooner because he and Brenda were having an affair at the time of the incident. He stated that he was in Brenda's bedroom when Watson arrived and watched the events from the bedroom window. Villafuerte observed the victim standing near Watson's car shouting and throwing his arms in the air. He then saw defendant approach the victim. Villafuerte

---

[8] Defendant admitted that the victim did not threaten him with the knife, did attempt to cut him with the knife, and did not attempt to stab him with the knife. He also denied that he intentionally stabbed the victim.

[9] In defendant's first appeal, this Court concluded that "[t]he number, locations, and the nature of the victim's stab wounds, especially the fatal, deep wound to the victim's abdomen, reasonably convey that defendant stabbed the victim intentionally, not accidently." *People v Castillo*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2011 (Docket No. 294354), p 2.

[10] Brenda asserted her Fifth Amendment privilege against self-incrimination and did not testify at trial.

maintained that the victim hit defendant and Brenda's fifteen-year-old son. Thereafter, defendant and the victim engaged in a physical fight. Villafuerte maintained that he saw the victim pull a knife from his waistband. The victim and defendant continued to fight, eventually falling to the ground. After fighting for a few moments on the ground, defendant stood up, but the victim remained on the ground. Villafuerte said that Brenda, her son, and defendant all got into Brenda's vehicle. But, before leaving, Brenda came back into the house to tell Villafuerte to exit out the back door. Villafuerte drove to his home in Indiana. Brenda later came to Villafuerte's home to borrow his vehicle. Shortly thereafter, Villafuerte learned that defendant, Brenda, and Brenda's son were all arrested.

The trial court held an evidentiary hearing. Villafuerte's testimony was simultaneously translated through an interpreter. He stated that, although he and Brenda were married in 2011, he did not tell Brenda or defendant that he witnessed the February 2009 incident until an "accidental conversation" in December 2015 while they were visiting defendant in prison. He maintained that he did not tell anyone earlier because he was afraid that he would be in trouble with the police. Villafuerte testified that on the morning of the incident, he heard a knock at the door and thought it was Brenda's husband. When he looked out the bedroom window, he saw Watson and two men. As Watson was taking her son to the car, Villafuerte saw the victim raising his hands in a threatening motion and he heard him shouting to someone. Villafuerte observed defendant exit the home. Then, defendant and the victim engaged in a physical fight on the driveway. The fight moved down the driveway towards the street. During a lapse in the fight, Villafuerte saw the victim remove a knife from his waistband. Villafuerte never saw defendant with the knife nor did he see either man make stabbing motions. The ground was covered with snow and ice. The two men fell to the ground near the mailbox. Defendant eventually got up, but the victim did not. Villafuerte did not see the knife again. Villafuerte described the knife as large and easy to see, stating that it was a "normal sized kitchen knife." Although Villafuerte claimed that he could easily see the knife in the victim's hand, he claimed that he could not tell if the victim had gloves on, stating that he was not looking for the details of the victim's hands at the time. Villafuerte also testified that Brenda came back into the house to speak with Villafuerte before she left with defendant and her son.

At the end of the hearing, the trial court commented on Villafuerte's testimony, finding it "rather incredible" and highly lacking in credibility. The parties were directed to file supplemental briefs. The trial court ultimately denied defendant's motion. This appeal followed.

### III. NEWLY DISCOVERED EVIDENCE

Defendant argues that the trial court erred by denying his motion for a new trial on the basis of newly discovered evidence. We disagree.

### A. STANDARD OF REVIEW

This Court reviews a trial court's decision regarding a defendant's motion for a new trial for an abuse of discretion. *People v Rogers*, 335 Mich App 172, 191; 966 NW2d 181 (2020). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* "A mere difference in judicial opinion does not establish an abuse of discretion." *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018).

Any factual findings by the trial court are reviewed for clear error. *Id.* at 565. A finding is clearly erroneous when this Court "is left with a definite and firm conviction that the trial court made a mistake." *Id.* "In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

## B. ANALYSIS

MCR 6.502(G)(2) authorizes a defendant to file a successive motion for relief from judgment based on newly discovered evidence. Generally, courts are reluctant to grant new trials on the basis of newly discovered evidence. *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012). Our Supreme Court has established four requirements that a defendant must meet to demonstrate that a new trial is warranted on the basis of newly discovered evidence:

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citation omitted).]

The defendant bears the onus of establishing "the requisite showing" regarding the four elements of the *Cress* test. *People v Rao*, 491 Mich 271, 274; 815 NW2d 105 (2012). In this case, the trial court concluded—and the parties do not dispute—that Villafuerte's testimony met the first three *Cress* factors. Thus, the central issue on appeal is the fourth prong of *Cress*.

As our Supreme Court has explained, a trial court must first determine whether the newly discovered evidence is credible in order to determine whether a different result is probable on retrial. *Johnson,* 502 Mich at 566-567. All relevant factors tending to either bolster or diminish the veracity of the witness's testimony should be considered by the trial court. *Id.* at 567. The trial court's credibility assessment should contemplate a future trial and the role of a future fact-finder. *Id.* at 568. "If a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment." *Id.* (emphasis in original). But if a witness is not patently incredible, a trial court must consider how a reasonable juror would evaluate the testimony. *Id.* In determining whether new evidence makes a different result probable on retrial, the trial court must consider the evidence that was previously introduced at trial. *Id.* at 571.

In this case, the trial court did not use the phrase "patently incredible" but opined that Villafuerte was one of least credible witnesses that it had encountered. The trial court found that Villafuerte's testimony was inconsistent with all of the other evidence that had been presented at trial. For example, the trial court noted that Villafuerte testified that Brenda came back into the house after the incident and spoke briefly with him. But all of the other witnesses, including defendant and a disinterested neighbor, testified that Brenda, defendant, and Brenda's son got into Brenda's vehicle *immediately* after the stabbing incident and drove away. In fact, Evans testified that he had to hurry to drag the victim out of the way as Brenda backed out of the driveway and sped off. The trial court also found it "illogical" that Villafuerte kept silent for years while his wife's brother was imprisoned. Considering all of the evidence, including Villafuerte's new

testimony, the trial court concluded that defendant's guilt was compelling and that Villafuerte's testimony would not make a different result probable on retrial.

We find that the trial court did not clearly err in determining that the testimony of Villafuerte was not credible. First, Villafuerte's claim that he kept silent for more than six years while his wife's brother was imprisoned is so incredible that it significantly diminishes his veracity. Further, Villafuerte's testimony is so inconsistent with all of the other evidence, that it is not likely that his testimony would make a different result probable on retrial. Villafuerte testified that he was hiding upstairs looking out from Brenda's bedroom window when he saw the victim yielding a knife while standing behind Watson's car and near the street. But Evans, who was standing only a few feet away, did not see either of the men holding a knife. When both of the men were on the ground, Evans saw defendant making stabbing motions, but did not see the knife until defendant stood up and the knife fell from defendant's sleeve. Brenda's son was also standing in close proximity to the fight, but he never saw a knife. Defendant testified that the first time he saw the knife was when the victim had it in his hand as he was getting up off of the ground and he dropped it. And the victim's DNA was not on the handle of the knife. Moreover, Villafuerte's testimony that Brenda went back into the house to speak with him after the stabbing is inconsistent with testimony of Watson, Evans, Brenda's son, and even defendant. All of the witnesses testified at trial that Brenda, her son, and defendant *immediately* jumped into Brenda's vehicle and drove away.

We are not left with a definite and firm conviction that the trial court made a mistake in its assessment of Villafuerte's credibility. We also find that the trial court did not err in concluding that Villafuerte's testimony would not make a different result probable on retrial. Considering the evidence presented at trial as discussed in detail in this opinion, as well as Watson's recantation testimony,[11] we find that the evidence against defendant is compelling. Accordingly, the trial court did not abuse its discretion when it denied defendant's motion for relief from judgment.

---

[11] When assessing a claim of newly discovered evidence, a court must consider the evidence that was previously introduced at trial, as well as the evidence that would be admitted at retrial, including recantation testimony. *Johnson,* 502 Mich at 571. Defendant's first motion for relief from judgment included a 2009 affidavit prepared by Watson that included several statements that were inconsistent with her trial testimony. For example, she swore in her affidavit that the victim made threats towards defendant before the deadly altercation, but she denied any such threats during her trial testimony. She also swore in her affidavit that the victim threw the first punch. However, at trial, she testified that she was in her vehicle calling 911 as defendant and the victim started to fight behind her car and she did not see who threw the first punch. Nevertheless, Watson's claim that the victim threw the first punch is simply cumulative of the testimony of defendant and his nephew who both testified that the victim threw the first punch. "As a rule the court is not impressed by the recanting affidavits of witnesses who attempt to show that they perjured themselves at the trial." *People v Norfleet*, 317 Mich App 649, 661; 897 NW2d 195 (2016) (citation omitted); see also *People v Barbara*, 400 Mich 352, 362-363; 255 NW2d 171 (1977) ("Where such [newly discovered] evidence, however, takes the form of witnesses' recantation testimony, it has been traditionally regarded as suspect and untrustworthy."); *People v Van Den*

IV. ALLEGED TRANSLATOR ERRORS

Defendant argues that he is entitled to a new evidentiary hearing because the interpreter who translated for Villafuerte at the evidentiary hearing was uncertified and made several translation errors. We disagree.

## A. STANDARD OF REVIEW

This Court reviews the trial court's decision to deny defendant's request for a second evidentiary hearing for an abuse of discretion. See *People v White*, 307 Mich App 425, 429; 862 NW2d 1 (2014).

## B. ANALYSIS

The rules for appointing a foreign language interpreter are set forth in MCR 1.111. Under MCR 1.111(B)(1), an interpreter should be appointed if needed for a witness testifying in a criminal case. Relevant to this case, MCR 1.111(F) states:

> (1) When the court appoints a foreign language interpreter under subrule (B)(1), the court shall appoint a certified foreign language interpreter whenever practicable. If a certified foreign language interpreter is not reasonably available, and after considering the gravity of the proceedings and whether the matter should be rescheduled, the court may appoint a qualified foreign language interpreter who meets the qualifications in (A)(6). The court shall make a record of its reasons for using a qualified foreign language interpreter.
>
> (2) If neither a certified foreign language interpreter nor a qualified foreign language interpreter is reasonably available, and after considering the gravity of the proceeding and whether the matter should be rescheduled, the court may appoint a person whom the court determines through voir dire to be capable of conveying the intent and content of the speaker's words sufficiently to allow the court to conduct the proceeding without prejudice to the limited English proficient person.

In *People v Cunningham*, 215 Mich App 652, 654-655; 546 NW2d 715 (1996), this Court explained:

> As a general rule, the proceedings or testimony at a criminal trial are to be interpreted in a simultaneous, continuous, and literal manner, without delay, interruption, omission from, addition to, or alteration of the matter spoken, so that the participants receive a timely, accurate, and complete translation of what has been said. Although occasional lapses will not render a trial fundamentally unfair,

*Dreissche*, 233 Mich 38, 46; 206 NW 339 (1925) ("[R]ecanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true.") (quotation marks and citation omitted).

adequate translation of trial proceedings requires translation of everything relating to the trial that someone conversant in English would be privy to hear. [Citation omitted.]

In this case, defendant argues that the translator was not certified[12] and, since he was not registered with the State Court Administrative Office, he was not qualified under MCR 1.111(A)(6) either. But defendant did not question the translator's credentials at the hearing or object to the hearing proceeding with the translator. The first time this issue was raised was in defendant's supplemental brief that was filed after the evidentiary hearing. Nonetheless, we find that the translation errors, whether viewed separately or cumulatively, did not adversely impact the trial court's understanding of Villafuerte's testimony. The translator properly conveyed the overall meaning of Villafuerte's testimony. And none of the errors were material to the court's conclusion that the testimony was not credible. The allegedly imperfect translation was not the source of the trial court's doubt in regard to Villafuerte's credibility. Ultimately, we do not believe that these translation errors affected the outcome of the lower court proceedings or that holding a new evidentiary hearing with a certified translator would lead to a different outcome. See *People v Truong (After Remand)*, 218 Mich App 325, 332 n 4; 553 NW2d 692 (1996) (stating that the defendants were not entitled to relief on appeal on the basis of imperfect translations because the translations did not result in any prejudice). As a result, the trial court did not abuse its discretion by declining to schedule a second evidentiary hearing. See *White*, 307 Mich App at 429.

## V. CONCLUSION

The trial court did not err in its assessment that Villafuerte was not credible and that his testimony would not make a different result probable on retrial. Accordingly, the trial court did not abuse its discretion when it denied defendant's motion for relief from judgment. Also, any alleged translation errors did not affect the trial court's determination that the witness's testimony was not credible and, therefore, the trial did not abuse its discretion by declining to schedule a second evidentiary hearing. We affirm.

/s/ David H. Sawyer
/s/ Anica Letica
/s/ Sima G. Patel

---

[12] At the hearing, the trial court asked whether the translator had his certification number, and he simply answered "no."